No. 12,987.

HEIRS OF AMERON LEDOUX VS. LEON LAVEDAN ET ALS.; GEORGE W. LEWIS, INTERVENOR.

| 52 | 311 |
| 123 | 865 |

## SYLLABUS.

The purport and effect of confiscation proceedings and sale of property on the ultimate title of the confiscatee after his pardon and subsequent death, find their best expression in the jurisprudence of the Supreme Court of the United States, which is, necessarily, binding on this court, as they are the final arbiters of all questions founded on laws of Congress.

As by that court it has been decided that the effect of such proceedings was to leave in the confiscatee no estate or interest of any description, which he could convey by deed, and no power which he could exercise in favor of another; and that it was the intention of Congress in enacting such laws that their benefit should enure to his heirs exclusively, and to enable them to take the inheritance after his death, we must, necessarily, hold, that such was the effect of the confiscation after the death of Hyams, and that the title to the property in question vested in his heirs.

As it has been decided, also, that after confiscations the fee simple title was withheld, exclusively for the benefit of the heirs, and that they alone could take it at the termination of the life estate which was conveyed to the purchaser at confiscation sale, it is the duty of this court to give a like effect to the title of the heirs at the death of Hyams.

The motive and object of the constitutional ordinance declaring that confiscation should not work the corruption of blood in the confiscatee, was evidently to save the rights of his heirs, while divesting absolutely and entirely all his beneficial interest in the property confiscated. It was the manifest purpose of Congress, as an incident of the war power of the government, to deprive him of all control over his property, and that amnesty, while the property remained in the possession of the purchaser at confiscation sale, should only invest the confiscatee with the more perfect means of transmitting title to his heirs at his death.

The question of the effect of pardon and amnesty upon the destination of the remaining estate of the offender, still outstanding after a confiscation of the property, and during his natural life, has never been settled by that court, but it remains a doubtful proposition as to what became of the fee or ultimate estate in that condition. It has been suggested that the fee remained in the person whose estate was confiscated, but without any power in him to dispose of, or have control over it. After amnesty, it has been held by that court, that the remnant of the estate, whatever its nature, and wherever it went, was never beneficially disposed of, but remained in a state of suspended animation, until the time of his death, when the legal title passed to his heirs.

But, if this be considered a doubtful proposition, it seems perfectly clear that the creditors of the confiscatee having acquiesced in the possession of the heirs, through a long series of years without question or complaint, are equitably barred and estopped from disturbing the titles derived from them.

ON REHEARING.

1. A person who has knowledge of his rights and ample opportunity to establish them, but culpably, or negligently, and for many years, allows others to believe that they are worthless, or that he has abandoned them, thereby superinducing such changes of position, and so affecting the rights of third persons, that relief cannot be afforded without injustice to those who have been less culpable, or negligent, must himself bear the consequences of his own laches.

2. Where a person acquiesces in the construction placed by the trial court upon a judgment rendered by it, and provokes, or participates in, a proceeding, itself resulting in a judgment, the effect of which is to construe a judgment previously rendered, and such person makes no complaint thereof, at the time, he will not be heard, after the lapse of many years, and after others have acquired rights with respect to the construction so arrived at and acquiesced in, to complain that it was unauthorized or incorrect.

3. Where heirs enter into the possession of property inherited by them, and effect a judicial partition thereof, they are considered as accepting the succession of him from whom they inherit, and, whilst they thus make themselves personally liable for the debts of the succession, creditors who are without mortgages, liens, or privileges, on such property, who have not demanded a separation of patrimony, or security from the heirs, or who have not demanded that such property should be administered, or, in case such demand has been denied by the court, have acquiesced in such denial, have no special rights with regard to the property thus made the subject of partition, and if the title of the *de cujus* was good, the title of the heirs, "declared" by a partition in kind, or resulting from a sale, and of those who may acquire from them, if otherwise unobjectionable, is a "just title", for the purposes of the prescription of ten years, *acquirendi causa*. They need no new title.

A PPEAL from the Civil District Court, Parish of Orleans. *Theard, J.*

*Richardson & Soule* for Plaintiffs and Appellants.

*Benjamin Ory* for Leon Lavedan, Defendant and Appellee.

*Kernan & Gowland* for Laura R. Hyams Thomas, Administratrix of the Successions of H. H. and L. H. Hyams, Defendant and Appellee.

*Jerome Meunier* for Jean D. Dupont, Defendant and Appellee.

*T. O. Stark* for Intervenor and Appellant.

In original opinion Mr. JUSTICE BLANCHARD concurs in the decree; NICHOLLS, C. J., recuses himself, having been of counsel in the original litigation; MONROE, J., takes no part, not having been a member of the court when the case was submitted.

On the rehearing the opinion of the court was delivered by MONROE, J.

(BREAUX, J., and BLANCHARD, J., concurring in the decree on the ground of the prescription pleaded; NICHOLLS, C. J., recused).

The opinion of the court was delivered by

WATKINS, J. In the case of same title, No. 12,383, 49th Ann., 913, the issues which we are to decide in the instant case, are very fully stated, and reference is made thereto for particulars.

From that case we find, that the plaintiffs are the heirs of a creditor of the succession of the late Henry M. Hyams, whose claim was evidenced by a judgment rendered in 1866, and since that time kept alive in the mode prescribed by law; and their action is for a decree against the defendant, declaring that the property described in the petition is that of said succession—deceased having died insolvent—and should be brought into the succession for sale, in order that its proceeds when sold should be applied to the payment of creditors mentioned in the account of the administrator..

Petitioners allege that the life interest of H. M. Hyams in said property had been confiscated by the United States Government and sold; and that, subsequently, Hyams was pardoned by the amnesty proclamation of the President of the United States, and restored to his rights.

That he and his wife died in 1875, and that an administrator for their successions was appointed in 1877, who filed a provisional account of administration.

*Ameron Ledoux did not oppose the account;* but an opposition to said account was filed by Mrs. Camille Lewis, the transferrer of the claim of George W. Lewis, intervenor, wherein it was alleged that said property appeared to have been sold by H. M. Hyams to his son. Isaac S. Hyams, title to which was simulated.

It is further charged therein that there are other properties which I. S. Hyams ostensibly purchased for himself, but which, really,

belonged to the succession of H. M. Hyams; (1) because they were made in the vendee's name, for the use and benefit of H. M. Hyams, who furnished the funds; (2) that the vendors in those sales to I. S. Hyams had themselves only purchased the life interest or usufruct of the property at the confiscation sales made by the United States Marshall, and only sold to I. S. Hyams, the right which they had purchased—that is to say, the life interest therein; (3) and that although H. M. Hyams intervened in those acts of sale and made himself party thereto, he could not, thereby, ratify or confirm them to I. S. Hyams, so as to convey to the latter an absolute and enduring ownership in the property; (4) that by the death of H. M. Hyams, the life interest or usufruct in the property became extinguished and the ownership *reverted to his succession,* subject to the rights of his creditors.

From the foregoing statement it appears, that the claims of the plaintiffs as the heirs of a creditor of H. M. Hyams, are founded exclusively, upon the theory that the title of all the properties which are described in the petition, vested in the succession of H. M. Hyams at his death in 1875, for the reason that only his life estate therein was confiscated by the government, and, as a consequence of that theory H. M. Hyams did not convey, and had not the capacity to convey any valid title to his son Isaac S. Hyams, as related in the deeds of sale.

From the foregoing statement, it further appears, that the opponent, Lewis, makes two distinct charges against the titles of I. S. Hyams, and divides the property into two classes, to-wit:

(1)   Those which appear to have been made by H. M. Hyams to his son Isaac S. Hyams—his son and administrator—(2) those which I. S. Hyams purchased from those persons who had purchased said properties, or rather, the life estate of H. M. Hyams, at confiscation sale by the government.

It further appears that the opponent seeks to have brought into the succession the property of the first class, because (1) the title thereto is simulated as well as confiscated; and (2) because I. S. Hyams purchased that of the second class from those who bought at the confiscation sale.

In the lower court the defendant filed a plea of *res judicata,* and that plea was sustained, and the plaintiffs and intervenors prosecuted to this court an appeal from the judgment of dismissal.

In this court that decree was altered in the particulars above enumerated, and remanded.

It appears from our opinion that the judgment on which the plea of *res judicata* rests was rendered by the judge of the Second District Court for the Parish of Orleans, the substance of which is as follows:

That by the confiscation sale, the interest of H. M. Hyams was divested, but it did not vest a fee simple title in the purchaser of the property, and that the purchasers at such sale could not convey a title transferring the property in full ownership; but, that at the death of H. M. Hyams, his children took said properties which were once his, by virtue of the statute and the Federal Constitution, and that, consequently, they could not be brought into his succession, having descended to the heirs.

We find from our opinion that whilst sustaining the plea of *res judicata,* with respect to the intervenor, we held, that it could only apply to the title of property of the second class and not as to the first, with respect to which all issues were left open for determination—our opinion stating that "the issue, as we appreciate the judgment from which this appeal was taken, was *res judicata vel non* as to second class."

Further reference to our opinion shows that we held, that plaintiffs as creditors of the succession were not estopped by the proceeding in the Second District Court between another creditor and the administrator, notwithstanding both "were parties to the provisional account which had been homologated so far as not opposed."

The opinion further states on this subject that "we think it would be going out of fixed limits to hold, that the administrator represented the heirs and creditors in an action to compel him to deliver property to which he claims title—the administrator in such an action, which involved his personal interest, representing himself only."

The theory of our opinion was, that in such a suit, the succession had no legal defender; that he could not be both plaintiff and defendant—citing Harris vs. Pickett, 37 Ann., 740, and Thomas vs. Bienvenue, 35 Ann., 937.

Summarizing the foregoing statements of fact and recitals from our opinion, the situation of the litigation at present seems to be, (1) that the issue to be decided as between plaintiff and defendant is,

the validity *vel non* of defendant's title from H. M. Hyams traced through the confiscation proceedings against H. M. Hyams; and (2) that between the intervenor and defendant is the simulation *vel non* of the titles from H. M. Hyams to I. S. Hyams, as well as to the confiscation of the title of H. M. Hyams—that is to say, those enumerated in the first class mentioned in his opposition.

But, a reference to the record discloses that the plaintiff filed an amended and supplemental petition on the 12th of January, 1898, since the remanding of the case, in which the following substantial averments occur, to-wit:

That "after the confiscation of the life estate in and to the property herein claimed, as set forth in the original petition, the deceased H. M. Hyams caused a simulated sale to be made of said property to I. S. Hyams, also deceased.

"That said simulation was declared by a judgment of this Honorable Court rendered on the 21st of February, 1878, in the cause entitled 'Succession of H. M. Hyams,' No. 339 of this Honorable Court, as will more fully appear by reference to a copy of said judgment, and the reasons thereto attached, herewith filed.

"That said property was ordered to be restored to said succession, but said judgment has never been carried into effect."

Referring to plaintiffs' original petition in record No. 12,383, we find the plaintiffs claim stated to be, as follows, to-wit:

"That said estate owns the following property situated in this city, to-wit:

"A tract of land containing 22 19-100 acres, in the rear of Suburb Plaisance and St. Joseph, being the upper one-third of section 8, township 13 south, of Range 11 East; the entire section containing 105 98-100 acres, according to survey made by G. A. Grandjean, United States Surveyor in 1888, approved by Calhoun Fluker, then Register of the United States Land Office.

"That said H. M. Hyams, deceased, acquired one-half of said property from Thos. R. Winston, on the 17th day of June, 1855; * * * one-sixth on the 28th of April, 1859, from George May; * * * one-sixth on the 15th of February, 1862, from C. C. Beard; * * * and, finally, Isaac S. Hyams acquired, for account of estate of H. M. Hyams, one-sixth of C. C. Beard."

All these sales were evidenced by notarial acts.

"That said property is now in the possession of Leon Lavedan,

\* \* \* who claims to be the owner thereof. That he holds and possesses said property by no legal or valid title from the estate of H. M. Hyams, or any valid transfer thereof."

Petitioners aver "that the lifetime interest in said property of H. M. Hyams was confiscated by the United States Government and sold.

"That thereafter, on the 25th of December, 1866, the said Hyams was pardoned by the general Amnesty Proclamation issued by the president, which restored him to all of his rights, except the life interest in said property.

"That after his death, the said property belonged to his estate, and no legal or valid alienation thereof could have been made, except by the order of this court to pay the debts due to the petitioners and other creditors."

They aver that the present administrator of the succession has been called upon to bring this suit, but has neglected to do so.

That she and her co-heirs have taken possession of his estate, and, especially, of the above described property; and, they aver and are informed, that said heirs are the warrantors of the defendant, and that the estate of H. M. Hyams is insolvent, and said heirs have no interest therein.

That, it is necessary to cause the title standing in the name of Lavedan to be annulled, and the possession thereof restored to said succession, to be therein inventoried and sold to pay the debts of your petitioners in due course of administration.

It appears from the prayer of said original petition that Leon Lavedan and Miss Laura R. Hyams, administratrix of the estate of H. M. Hyams, were the only parties cited, and that the property described was the only property claimed therein.

The contention of intervenor as stated in his opposition (after making a similar statement to that contained in the petition of plaintiff) is as follows:

That the remaining estate vested unconditionally in said Hyams, and that upon that date the full ownership vested in his succession, and subject to the charge upon it; and that by the administration of his estate "the beneficiary heirs ceased to be proprietors and possessors of any property depending in his succession, or left by him at his decease, and any alienation of any part thereof \* \* \*

became, thenceforth, impossible, except under order and supervision of this court."

That said defendant, Lavedan, is a possessor, if at all, which is denied, in bad faith, and that he and all his antecedent vendors are and were fully aware of the defects of the title which they alleged as a basis of ownership.

Opponents unite with the plaintiff in praying "that the pretended sale by Wm. A. Dickson to Leon Lavedan, defendant herein, of date 24th of October, 1893, * * * of the upper third of section 8, township 13, range 11 east, lying in the Sixth Municipal District, containing 22 19-100 acres, be declared null and void, and that same be restored, as has been heretofore ordered by judgment of February 21, 1878, rendered by the late Second District Court, to the succession of H. M. Hyams, Sr., and sold in due course of administration."

The opponent prays for citation to Lavedan and Miss Laura Hyams, administratrix.

As a peremptory exception, Lavedan plead the prescription of three months and ten years; also, the plea of res judicata founded on a judgment of the Second District Court on the 21st day of February, 1878, in the succession of H. M. Hyams, homologating the account of the administrator, and dismissing the opposition of the creditors.

In the present suit, 12,987, Lavedan appears, and makes the following answer, reserving all his rights under his peremptory exception—his plea of res judicata having been disposed of by our previous opinion has passed out of the case.

That he is in the actual and physical possession of a part of the property sued for, to-wit:

The upper undivided one-third of section 8, township 13 south, range 11 east, in the southwestern land district of Louisiana, containing 22 19-100 acres.

That he acquired said property in good faith from W. A. Dickson for six thousand dollars cash, by notarial act dated October 24, 1893, and duly recorded in the conveyance office.

That W. A. Dickson acquired said property by purchase from Fergus Kernan by act under private signature, dated July 26, 1893, and duly recorded in the conveyance office.

That Kernan acquired one undivided half in said property by pur-

chase from the succession of H. M. Hyams, Jr., by notarial act dated April 9, 1891, duly recorded in the conveyance office.

That he acquired the other undivided half of said property by purchase from Francis R. Wall by notarial act dated February 18th, 1891, and duly recorded in the conveyance office.

That Francis R. Wall and Henry M. Hyams, Jr., acquired the *whole* of the above mentioned property, at public auction sale in the city of New Orleans, on July 19, 1884, by virtue of a judgment of the Civil District Court, rendered on June 10, and filed on June 18, 1884, ordering a sale of said property to effect a partition thereof by licitation, between the co-heirs of the same in the suit entitled Henry M. Hyams *et als.* vs. Lelia L. Hyams, tutrix, evidenced by notarial acts dated February 13, 1885, and duly recorded in the conveyance office.

That said public sale to said Henry M. Hyams, Jr., and Francis R. Wall was made under a valid judgment, after proper citation to all parties in interest, and vested in them a good and valid title to said property; that by said sale, said property passed to Wall and Hyams free and clear of all liens, privileges or mortgages inscribed against the same and against "their author, the late Henry M. Hyams, Sr., as appears from the mortgage certificate annexed to the act of sales."

That he (Lavedan) and his authors having been in quiet peaceable and physical possession of said property for over ten years, and having so held same in good faith for that length of time, he now pleads against, and in bar of plaintiff's recovery, the prescription of three months, and of five and ten years.

Wherefore, defendants prays that plaintiff's demands be rejected.

To the intervention, Leon Lavedan's answer is, substantially, the same as that to the original petition; and that of Laura Hyams, administratrix, is, substantially, the same as that of Lavedan.

A careful consideration of the foregoing analysis of the pleadings and issues which are at present open to discussion and presented for decision, disclose the fact to be, that there is but one piece of unimproved real estate involved in this litigation, and that is the upper undivided one-third of section eight (8) township thirteen (13) south, of range eleven (11) east—consisting of twenty-two and 19-100 acres.

The record discloses—and the fact is one judicially admitted in the pleadings, as well as having been made the subject of an admission by counsel—that same was, amongst other properties, confiscated by

the United States Government and sold, during the lifetime of H. M. Hyams; and that, treating the confiscation sale as having had the effect of conveying a life interest or estate therein only, to the purchaser, H. M. Hyams subsequently made a title thereto to his son, Isaac S. Hyams.

These facts, necessarily result in placing this property in the first class—as above outlined—and bringing it within the range and scope of both the plaintiff's and opponent's demands; that is to say for the annulment of the title of Lavedan, on the ground that (1) the title from H. M. Hyams to Isaac S. Hyams was purely fictitious and simulated, and did not convey the ownership of the property; (2) that the confiscation sale having transferred only the life interest of H. M. Hyams, the property in full and complete ownership was, at his death, transmitted to his succession for administration, according to law; (3) that the heirs of H. M. Hyams having taken possession of said property, amongst others, and partitioned it between themselves, and same having been omitted from the inventory of their ancestor's estate, they, as creditors thereof, have a right and interest in having the title of defendant, which is derived from and through said partition, decreed null, and the property restored to the succession to which it belonged.

Considered from the standpoint of the plaintiffs and intervenor, as an original proposition, we are to determine the effect of the confiscation proceedings and sale in respect to the rights and interests of the *heirs* of H. M. Hyams, the adjudicatees, and that alone; because (1) the sale from H. M. Hyams to his son Isaac S. Hyams if simulated, conveyed no title to him, but left the ownership *in statu quo;* and (2) the defendant, Lavedan, traces his title back to the partition amongst the heirs of H. M. Hyams, and no further—and does not set up any title as derived from Isaac S. Hyams.

But, in the record we find an act of renunciation by Isaac S. Hyams of his interest in the property in controversy amongst others, in favor of the heirs of H. M. Hyams, which contains the following recital, viz:

"Said property having been confiscated and sold by the United States Government as that of Henry M. Hyams (it) reverted by the latter's (death) exclusively to his heirs, to-wit: Isaac S. Hyams, the undersigned; Henry M. Hyams, Jr., Richard K. Hyams; Ingram R. Hyams; Clarence D. Sprigg, and the children of the deceased Kosci-

usko R. Hyams, viz: Emma, Bertha and Daisy—and in whose favor therefore its present holder, the undersigned, hereby renounces every claim of title to its ownership."

That relinquishment was signed by Isaac S. Hyams on the 29th of August, 1877, authenticated on the 30th of August, 1877, before a notary, and duly registered in the conveyance office on the same date.

It further appears that on the 4th of May, 1866, Henry M. Hyams conveyed by notarial act to his son, Isaac S. Hyams the property in controversy, amongst many other properties therein described, for the expressed consideration of $16,400 for which the purchaser executed twenty-seven promissory notes, made payable to the order of the Citizens Bank, at different dates in the future, and secured by mortgage and vendor's lien on the property sold.

In that act, the following stipulation was made, viz:

"He does by these presents, grant, bargain, sell, convey, transfer, " assign, and set over, with all legal warranties, and with substitu- " tion and subrogation to all his rights and actions of warranty, unto " Isaac Smith Hyams, here present, accepting and purchasing, etc."

That act of sale was duly registered in the book of conveyances.

Henry M. Hyams died in 1875—nine years subsequent to said sale—and it was two years after his death that Isaac S. Hyams made said relinquishment to the heirs—himself amongst the number.

In our opinion, that transaction can not be viewed or fairly interpreted as a simulation; on the contrary, it possesses all the *indicia* of a real and serious sale for a valid and adequate consideration, on its face, when it is taken by itself. But, in the light of the renunciation, it would seem, that the act should be treated and considered as having been intended to convey a title to the heirs, originally, and that for convenience, the name of Isaac S. Hyams, alone, was employed.

But, conceding the sale to have been without consideration, and the situation of the property is not different; for, putting it out of the way, the rights of the heirs are just the same—the effect of the confiscation proceedings and sale having ceased at their ancestor's death.

It was doubtless with a view to the renunciation of Isaac S. Hyams, that the partition proceedings were undertaken by the heirs of H. M. Hyams, in 1884; and they may have been, to some extent,

justified in so doing, by reason of the fact that his succession had at that time been under administration for nine years, without any mention having been made of the aforesaid properties in the inventory of his estate—the act of sale to Isaac S. Hyams having been of record for a period of nine years prior to the death of H. M. Hyams, and during that period of time the assignor of the intervenor had a judgment against H. M. Hyams, as securing the claim now sought to be enforced.

Necessarily, the jurisprudence established by the Supreme Court with regard to the construction to be placed upon confiscation sales, and the legal effect to be given thereto in respect to heirs of the deceased confiscatee, is controlling, and that of this court must yield in case there is any doubt as to what is a proper interpretation to be placed thereon.

In Beard vs. Lufriu, 46th Ann., 875, this court had occasion to examine and review a question closely assimilated to the one under consideration.

That was a petitory action instituted by the plaintiff as the owner of property, which is described in the conveyance from H. M. Hyams to Isaac S. Hyams of date May 4, 1866, to which reference is herein made *supra*—the only difference being that no mention is made in that case of the relinquisment by Isaac S. Hyams. Plaintiff's chain of title was by reconveyance from Arrowsmith to H. M. Hyams in 1864; by the confiscation proceedings and sale against Hyams in 1865, and adjudication to Jotham Potter; by conveyance from Potter to H. M. Hyams in February, 1866; and by reconveyance from Isaac S. Hyams to the plaintiff in 1870.

The defendants derived title through the judicial partition amongst the heirs of H. M. Hyams, in June, 1875 (above referred to) and from Ingram R. Hyams, February, 1866.

Therefore, it appears that the plaintiff claimed through the act of sale of 1866, from H. M. Hyams to Isaac S. Hyams, while the defendant claimed through the partition proceedings of 1885. The only difference there seems to be between that case and the instant one is, in the renunciation of I. S. Hyams to the heirs of H. M. Hyams; but same was not executed until 1877; seven years subsequent to the purchase of Beard from Isaac S. Hyams.

But, the court considered, and the parties treated the act of 1866 as binding and valid. There was in that case no question of simula-

tion—the only question being whether the recitals in that act had the effect of excluding the title of the heirs in the property.

In the opinion we say:

"The question for decision is, whether the plaintiff's title from *Isaac S.* Hyams is better than the title derived from *Ingram R.* Hyams—both titles being derived from H. M. Hyams as a common author; and Isaac S., and Ingram R. Hyams being heirs of H. M. Hyams."

In the defendant's answer it is alleged that Isaac S. Hyams never had any title to transfer to the plaintiff; and that, in consequence of the confiscation proceedings against H. M. Hyams, and the adjudication therunder, there was not left to said H. M. Hyams any interest of any kind which he could convey as he did, but that the ownership of said property reverted to the heirs of H. M. Hyams at his death. The defendant's counsel cites and relies on the following decisions of the Supreme Court as sustaining his view, to-wit:

"Wallach vs. Van Riswich, 92 U. S., 302.

"Chaffraix vs. Shiff, 92 U. S., 214.

"Pike vs. Wassell, 94 U. S., 711.

"French vs. Wade, 102 U. S., 132; Avegno vs. Schmidt, 113 U. S., 292."

Some of these authorities have been cited by counsel in the instant case, without, however, making any reference to the decision of this court in Beard vs. Lufriu. On this subject our opinion says:

"That such was the theory entertained by counsel who had charge of and conducted the proceedings in the partition of the H. M. Hyams property, there can be no doubt, as it appears from the face of the proceedings themselves."

But, we took occasion to state that in Jenkins vs. Collard, 145 U. S., 547, a somewhat different view had been entertained.

In speaking of that case we said that it "was an action of eject-ment, brought by the heirs of Jenkins, the confiscatee, for the recovery of the property which had been confiscated, and the life estate in which had been sold, and of which (property) the defendant, Collard, became the possessor during the lifetime of the confiscatee—plaintiffs alleging they had become seized of the legal estate in the premises, by reason of the death of their father, and entitled to possession."

That from the statement of fact given it appeared that in 1863 the property of Jenkins was confiscated and sold to one Bepler, who, afterward, conveyed to the defendant Collard, to whom Jenkins, the confiscatee, subsequently made a formal deed of conveyance in August, 1865.

"On this state of facts," we said: "The Circuit Court held, that only the technical life estate of Jenkins was confiscated by the decree of the court in 1863, 'but there was left in him the reversion or remainder which he sold and conveyed to the defendant, by deed of August 26, 1865, and that consequently, the plaintiffs had no interest in the property.'

"The Supreme Court, in passing upon this question, examined and carefully reviewed all of their previous utterances in reference thereto, and announced their adherence to the doctrine, that a confiscation sale only disposed of the life estate of the confiscatee, but, at the same time held that Jenkins' deed to Collard, of August 26, 1865, operated as an estoppel against him, and all persons under him, from claiming title to the property sold as against the grantee and his heirs and assigns, or against his conveying it to other parties.

"The court gave effect to the conveyance, made by the confiscatee, subsequent to the confiscation sale, and several years antecedent to the president's amnesty proclamation, on the authority of Van Rensselaer vs. Kearney, 11 Howard, 297, and Irvine vs. Irvine, 9 Wallace, 617."

Our examination of Jenkins vs. Collard led us to the conclusion that it was precisely applicable to the case then at bar, Beard vs. Lufriu, because, "the purchaser at the confiscation sale had executed a reconveyance to the confiscatee, H. M. Hyams, soon after the adjudication, and H. M. Hyams had executed a conveyance to his son Isaac S. Hyams, on the 4th of May, 1866, prior to the amnesty proclamation."

The following extract from Jenkins vs. Collard will serve to show the view entertained by the Supreme Court, of the effect of the confiscation sale, under the circumstances related, to-wit:

"Of the reversion or remainder of the estate of the offending party no disposition was ever made by the government. It must, therefore, be construed to have remained in him, but, under the ruling in Wallach vs. Van Riswick, without any power in him to alienate it during his life. That disability was enforced, when he (Jenkins)

executed, with his wife, the deed of the premises August 26, 1865. The proclamation of pardon and amnesty was not made by the president, until December 25, 1868. This deed, however, was accompanied with a covenant of seizin on his part, and that he would warrant and defend the title against the lawful claims of all persons whomsoever.

"Admitting that he had no present estate in the premises, and none in expectancy, he was at liberty to add to his deed the ordinary covenants of seizin and warranty, and the same legal operation upon future acquired interests must be given to them, as when accompanying conveyances of parties whose property has never been subject to confiscation proceedings.

"That warranty estopped him and all persons claiming under him from asserting title to the premises against the grantee and his heirs and assigns, or conveying to any other parties.

"When, subsequently, the general amnesty and pardon proclamation was issued, the disability, if any, that had previously rested upon him against disposing of the remaining estate which had not been confiscated, was removed, and he stood, with reference to that estate, precisely as though no confiscation proceedings had ever been had.

"The amnesty and pardon in removing the disability, if any, resting upon him respecting that estate, enlarged his estate, the benefit of which enured equally to his grantee.

"The removal of his disabilities did not affect the purchaser's right under the decree of confiscation. The latter remained in full enjoyment of the property during the life of the offending party, but, he had no claim upon the future estate, nor did the heirs of the offending party have any such claim upon it as to preclude the operation of any previous warranties by him respecting it."

From the foregoing, it appears quite clear that the plaintiff was held to be protected by the covenant of warranty which is contained in the act of sale from H. M. Hyams to Isaac S. Hyams, of May 4, 1866—the one to which we have referred, and from which we have quoted the warranty clause.

If the present record in the instant case disclosed no further fact, the decision of this court would, necessarily, be the same. But, the renunciation of Isaac S. Hyams in favor of the heirs, puts a different phase upon the rights of the heirs and operates a release in their favor of the bar of said warranty stipulations.

It had the effect of leaving them free to assert their claims to the property which had been confiscated.

This is illustrated by the following extract from our opinion in Beard vs. Lufriu, to-wit:

"The subsequent general amnesty which relieved the confiscatee of the disability that rested upon him, placed him in exactly the same position he would have occupied with reference to the property, had no confiscation proceedings been had; but, the benefit of the relief enured equally to his vendee and to those holding under him.

"So that, at the death of H. M. Hyams, his warranty title to I. S. Hyams operated against his heirs and their assigns, and defeats recovery by either."

As we have shown from the record, this condition of affairs continued to exist, until after the death of H. M. Hyams in 1875; and it was only changed by the renunciation which Isaac S. Hyams made in favor of the heirs, himself amongst the number, in August, 1877— two years subsequent to the death of H. M. Hyams.

This situation of the title continued to exist without change, until 1884; when the partition amongst the heirs was made, under which the defendant, Lavedan, obtained title, for what seems to have been a fair consideration, to-wit: six thousand dollars.

We think it well to cite a few of the decisions of the Supreme Court, in relation to the rights of the heirs to confiscated property, resulting from the pardon or death of the confiscatee.

In Wallach vs. Van Riswick, 92nd U. S., 202, the Supreme Court considered the purport and effect of the joint resolution of Congress, which declared that, "no proceeding shall work a forfeiture, beyond the life of the offender," and said that it did not mean "beyond the life estate of the offender."

"The obvious meaning is, that the proceedings for confiscation and sale shall not affect the ownership of the property, after the termination of the offender's natural life. After his death, the lands shall pass and be owned as if it had not been forfeited. * * *

"The words of the resolution are not exactly those of the constitutional ordinance; but, both have the same meaning, and both seek to limit the extent of the forfeiture. In adopting the resolutions, Congress manifestly had the constitutional ordinance in view; and, there is no reason why one should receive a construction different from that given to the other. What was intended by the constitu-

tional provision is free from doubt. In England attainders of treason worked corruption of blood, and perpetual forfeiture of the estate of the person attained, to the inheritance of his heirs, or of those who would, otherwise, be their heirs. Thus, innocent children were made to suffer, because of the offence of their ancestor. When the Federal Constitution was framed, this was felt to be great hardship, and even rank injustice.

"For this reason, it was ordained, that no attainder of treason should work corruption of blood or forfeiture, except during the life of the person attainted.

"No one ever doubted that it was a provision introduced for the benefit of the *children and heirs alone;* a declaration that the children should not bear the iniquity of the fathers. Its purpose has never been thought to be a benefit to the traitor, by leaving in him a vested interest in the subject of forfeiture."

In Pike vs. Wassell, 94 U. S., 711, the Supreme Court said:

"In Wallach vs. Van Riswick, 92nd U. S., 207, 208, we decided that after a seizure and an adjudicated condemnation and sale, under the confiscation act of July 17th, 1862, of the lands of one engaged in rebellion against the United States, there was 'left in him no estate or interest of any description which he could convey by deed, and no power which he could exercise in favor of another.'

"We also held that the joint resolution passed contemporaneously with the approval of the act, was intended for the *benefit of his heirs exclusively,* to enable them to take the inheritance after his death."

Again:

"It is true, as a general rule, that so long as the ancestor lives, the heirs have no interest in his estate; but the question here is, as to the rights which the confiscation act has conferred upon the heirs apparent or presumptive of one whose estate in lands has been condemned and sold. In Wallach vs. Van Riswick, without undertaking to determine where the fee dwelt during the life estate, we decided that it was withheld from confiscation *exclusively for the benefit of the heirs.*

"They, and they alone, could take it at the termination of the life estate."

But, in our opinion, the best considered and most forcible statement of the question is found in Illinois Central Railroad Company

vs. Bosworth, 133 U. S., 92, in which Mr. Justice Bradley, speaking for the court, said:

"The principal question raised in the present case is, whether by the effect of the pardon and amnesty granted to A. W. Bosworth by the special pardon of October, 1865, and the general proclamation of amnesty and pardon of December 25th, 1868, he was restored to the control and power of disposition over the fee simple or naked property in reversion expectant, upon the determination of the confiscated estate in the property in dispute.

"The question of the effect of pardon and amnesty on the destination of the remaining estate of the offender, still outstanding after a confiscation of the property during his natural life, has never been settled by this court.

"That the guilty party had no control over it in the absence of such pardon or amnesty, has been frequently decided.

"Wallach vs. Van Riswick, 92 U. S., 202; Chaffraix vs. Shiff, 92 U. S., 214; Pike vs. Wassell, 94 U. S., 711; French vs. Wade, 102 U. S., 132 and Avegno vs. Schmidt, 113 U. S., 293; Shields vs. Schiff, 124 U. S., 351.

"But it has been regarded as a doubtful question, what became of the fee or ultimate estate, after the confiscation for life.

"'We are not called upon,' said Justice Strong in Wallach vs. Van Riswick, 'to determine where the fee dwells during the continuance of the interest of a purchaser at a confiscation sale, whether in the United States, or in the purchaser, subject to be defeated by the death of the offender.'

"It has also been suggested that the fee remained in the person whose estate was confiscated, but without any power in him to dispose of or control it.

"Perhaps, it is not of much consequence, which of these theories, if either of them, is the true one; the important point being that the remnant of the estate, whatever its nature, and wherever it went, was never beneficially disposed of, but remained, (so to speak), in a state of suspended animation. Both the common and the civil laws furnish analogies of suspended ownership of estates which may help us to a proper conception of that now under consideration.

   *     *     *     *     *     *

"But, as already intimated, it is not necessary to be over curious about the intermediate state in which the disembodied shade of naked

ownership may have wandered during the period of its ambiguous existence. It is enough to know that it was neither annihilated, nor confiscated, nor appropriated to any third party. The owner, as a punishment for his offences, was disabled from exercising any acts of ownership over it, and no power to exercise such acts was given to any other person. At his death, if not before, the period of suspension comes to an end, and the estate revives and devolves to his heirs at law.''

The court in treating of the effect of the forfeiture by confiscation after the pardon of the confiscatee, but during his lifetime, made this statement:

"The property in question"—that of Bosworth—"had never vested " in any person when these acts of grace were performed. It had not " even been forfeited. Nothing but the life interest had been for-" feited. His power to enjoy or dispose of it was simply suspended by " his disability as an offender against the government of the United " States.

"This disability was a part of his punishment. It seems to be per-" fectly clear, therefore, in the light of the authorities referred to, " that when his guilt, and the punishment therefor were expunged by " his pardon, this disability was removed; in being restored to all his " rights, privileges and immunities, he was restored to the control of " so much of his property and estate as had not become vested, either " in the government or in any other person—especially that part or " quality of his estate which had never been forfeited, namely, the " naked residuary ownership of the property, subject to the usufruct " of the purchaser under confiscation proceedings.

"This result, however, does not depend upon the hypothesis that the " dead fee remained in Bosworth after the confiscation proceedings " took place; it is equally attained if we suppose that the fee was *in* " *nubibus,* or that it devolved to the government for the benefit of " whom it might concern.

   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

"Regarding the substance of things, and not their forms, the truth " is simply this: a portion of the estate, limited in time, was for-" feited; the residue expectant upon the expiration of that time, " remained untouched, undisposed of; *out of the owner's power and* " *control, it is true, but not subject to any other person's power or* " *control.*

"It was somewhere, or, possibly, nowhere. But, if it had not an
" actual, it had a potential, existence, *ready to devolve to the heirs of*
" *the owner upon his death,* or to be revived by any other cause that
" should call it into renewed vitality or enjoyment."

·   The foregoing decisions fully sustain the view, that the act of
Congress which authorized the confiscation of the estates and prop-
erties of persons who were engaged in the war of the rebellion against
the authority of the United States, was intended as a punishment of
the offender, and a sale thereunder, divested all his power and control
over them, and left the title thereto in a state of suspension, until the
offender obtained pardon, when it revived and became reinvested in his
heirs; and their right became absolute at his subsequent death.

The motive and object of the constitutional ordinance declaring
that confiscation should not work the corruption of blood in the con-
fiscatee, was evidently to save the rights of his heirs, while divesting
absolutely and entirely all his beneficial interest in the property con-
fiscated. It was the manifest purpose of Congress, as an incident of
the war power of the government, to deprive him of all control over
his property, and that amnesty, while the property remained in the
possession of the purchaser at confiscation sale, should only invest the
confiscatee with the more perfect means of transmitting title to his
heirs at his death.

The right and power of the offender, subsequent to his pardon, being
subordinated to the control and use of the purchaser at confiscation
sale during his life, the property was, necessarily, beyond the reach or
control of his creditors, during that period.

In Beard vs. Lufriu, 46th Ann., 875, the record discloses that
Jotham Potter became adjudicatee at the confiscation sale of the
property of H. M. Hyams, on the 18th of May, 1865; that he recon-
veyed the property to Hyams on the 3rd of February, 1866, and that
Hyams conveyed it to his son Isaac S. Hyams, on the 4th of May,
1866; that, thereupon, this court decided, that the transferee of Isaac
S. Hyams had a better title than the one derived by the defendant
Lufriu from the *heirs* of Hyams.

In Illinois Central Railroad Company vs. Bosworth, 133rd U. S.,
92, the heirs of Bosworth brought an action against the railroad
company to recover possession of a tract of land—their father having
died on the 11th of October, 1885.

The record discloses, that the property had been confiscated and

sold in 1868 to one Burbank, and that Burbank reconveyed to Bosworth, confiscatee, in 1872, and confirmed a sale made by Bosworth in 1871 to the railroad company, subsequent to Bosworth's pardon; and that on this state of facts the court held that the *heirs* could not recover.

The material difference between those two cases and the one now under investigation is, that in each of the former, the purchaser at confiscation sale executed a *reconveyance to the confiscatee, after his pardon,* the result of which was to place matters in *statu quo,* and to defeat the action of his *heirs;* while, in this case, the purchaser at confiscation sale *never made any reconveyance, but held possession of the property up to the date of Hyam's death.*

It is unquestionably true—and there are decisions which sustain the proposition—that creditors with mortgage or liens, retain their claim against the property, notwithstanding the confiscation; but that is supposed to have grown out of the fact that such mortgage or lien was a *quasi* alienation of the property antecedent to the date of confiscation.

Otherwise, the authorities are unbending to the effect, that as soon as the confiscatee receives his pardon, the title devolves upon his heirs, subject to the right of the purchaser, and becomes perfect at the time of his death.

The claim of neither the plaintiff nor the intervenor was secured by either lien or mortgage on the real estate of H. M. Hyams, anterior to its confiscation.

That of Ameron Ledoux, plaintiff's ancestor, was for a debt contracted, it is true, in 1861, but not liquidated by judgment until 1866, subsequent to the confiscation sale, and prior to the date of the pardon of the confiscatee; while that of Camille Lewis, transferrer of the intervenor, was not liquidated by judgment until the administrator's account in the succession of H. M. Hyams was homologated in 1877, several years subsequent to the termination of the state of suspension, in which the legal title of Hyams was held by the Confiscation Act of Congress; and long subsequent to that date that it had vested in the heirs by the effect of the amnesty proclamation, and subsequently confirmed by his death.

This theory is strengthened by giving effect to the sale from H. M. Hyams to his son Isaac S. Hyams, during the period of time that the

property was subject to the use and control of the purchaser at confis-cation sale, and the renunciation of I. S. Hyams afterward.

But, if this proposition be considered of doubtful application, it seems perfectly clear that the creditors of Hyams have acquiesced in the situation of affairs which we have described, through a long series of years, and remained silent when they could have spoken, and should have opposed the proceedings which led up to the partition and sale, whereunder the defendant obtained title to the property in con-troversy; and, in equity, they should be considered as estopped from asserting any adverse pretensions thereto at this time.

For, whatever right the administrator or creditors of the succes-sion may have once had in respect to this property, the title of the defendant can not be at this time disturbed. His deed, and those of his predecessors, had been duly recorded for more than ten years, without any complaint having been urged against them, or any effort made to subject the property to administration for the benefit of the creditors. The records of the District Court clearly show, that the heirs asserted and exercised their rights as such publicly, openly and notoriously, and without any objection, during the administration of the succession of their ancestor, and at a time when the plaintiffs had a judgment for the amount of the debt now claimed, and the facts and circumstances of the case must have been fresh and well known to all the parties in interest. Heirs of McGehee vs. McGehee, 41st Ann., 657.

In Hammond vs. Hopkins, 143 U. S., 224, Chief Justice 'Fuller, in speaking for the court, said:

"No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross *laches* in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred."

In Willard vs. Wood, 164 U. S., 502, the court said:

"But the recognized doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time may be applied in the discretion of the court, even though the *laches* are not pleaded or the bill demurred to."

In Penn Mutual Life Insurance Co. vs. Austin, 168 U. S., 685, Mr.

Justice White speaking for the court, after citing numerous authorities, used this language:

"The reason upon which the rule is based is not alone the lapse of time during which the neglect to enforce the right has existed, but the changes of condition which may have arisen during the period in which there has been neglect. In other words, where a court of equity finds that the position of the parties has so changed, that equitable relief can not be afforded without doing injustice, or that the intervening rights of third persons may be destroyed or seriously impaired, it will not exert its equitable powers in order to save one from the consequence of his own neglect."

In Galliher vs. Caldwell, 145 U. S., 368, the court used this language:

"The adjudicated cases proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless or have been abandoned; and that, because of the change in condition or relations during this period of delay, it would be an injustice to the latter to permit him now to assert them."

In Lafitte vs. Godchaux, 35th Ann., 1162, this court used this language:

"The genius of our law does not favor the claims of those who have long slept on their rights, and who, after years of inertia, conveying an assurance of acquiescence in a given state of things, suddenly wake up at the welcome vision of an unexpected advantage, and invoke the aid of courts for relief, under the effect of a newly discovered technical error in some ancient transaction or settlement."

After a careful investigation of this case, and, in the light of the decision of this court, and those of the Supreme Court, our conclusion is (1) that the legal title to the property of H. M. Hyams passed at his death to his heirs, and from them to the defendant Lavedan; and (2) if that be a doubtful question, that the plaintiffs and intervenor are equitably estopped from attacking the defendants' title, because of their silence and apparent acquiescence in the action of the heirs in having taken possession of the property as owners so long ago, having judicially partitioned it among themselves, and sold it to strangers and third persons for a valuable consideration—particularly in view of the decree of the

Second District Court which was rendered contemporaneously with their taking possession—affirming the validity and legality of their pretensions. Heirs of Ledoux vs. Lavedan, 49 Ann., 913.

While it is not correct to say, and as we held in our former opinion, that the plea of res adjudicata predicated upon the judgment of the Second District Court was not good with respect to either the plaintiffs or intervenor, yet, it does come to the aid of the estoppel against them; and it may be justly considered and treated as possessing the effect of the estoppel of res adjudicata—that decree having been rendered in a litigation over an administrator's account to which they were both parties, and it having had the immediate effect of diverting from the estate to the heirs, the very property they now seek to hold liable for their claims.

On reason and authority the title of the defendant which is derived from the heirs of H. M. Hyams, confiscatee, must be recognized and enforced.

This was the view entertained by our learned brother of the District Court, and we concur in his opinion.

Judgment affirmed.

I concur in the decree, N. C. BLANCHARD.

CHIEF JUSTICE NICHOLLS recuses himself because he was of counsel in the original litigation, and MR. JUSTICE MONROE takes no part in this opinion, not having been a member of the court at the time of the submission of the cause.


ON REHEARING.

STATEMENT OF THE CASE.

MONROE, J. Plaintiffs and intervenor, claiming as creditors of the late H. M. Hyams, prosecute this suit against Leon Lavedan, J. P. Dupont, and Laura R. Hyams, administratrix, for the purpose of annulling the titles of the said Lavedan and Dupont to certain real estate in New Orleans, and having the same, with the rents and revenues thereof, brought into the succession of said Hyams, and subjected to the payment of their claims; the averments upon which the action is founded being, substantially, as follows, to-wit:

That plaintiffs, as heirs of Ameron Ledoux, and intervenor, as transferree of Mrs. Camilla S. Lewis, are judgment creditors of said

succession; that said Hyams died intestate, June 25, 1875; that administrators have been appointed, who have, at different times, filed inventories, purporting to include all the property of the estate, but which have not included the property herein claimed; that Laura R. Hyams is the present administratrix, and was called upon to file this suit, but neglected to do so, and that the amounts due to the petitioners and intervenor are still unpaid.

It is further alleged that said succession owns "a tract of land containing 22 19-100 acres, in the rear suburb Plaisance and St. Joseph, being the upper one-third of Section 8, Township 13 south, of Range 11 East; the entire section containing 105 95-100 acres, according to a survey made by G. A. Grandjean, U. S. Surveyor, in 1888, approved by Calhoun Fluker, then Registrar of the United States Land Office," which said tract is now in the possession of the defendant, Lavedan, who claims to be the owner; and that said succession owns "Square 572, bounded by St. Anne, Orleans, Napoleon, or Hennessy, and Alexander streets," which is now in the possession of the defendant Dupont, who claims to be the owner, and that said defendants have no valid titles, and are possessors in bad faith.

It is further alleged that the life interest of said H. M. Hyams in said property was confiscated and sold by the United States Government, and that, thereafter, to-wit, December 15th, 1868, by a general amnesty proclamation, said Hyams was pardoned·and restored to all his rights therein, save such life interest, and that, at his death, said property belonged to his succession, and could not be alienated, save by order of court, to pay debts.

It is further alleged that the administratrix, "and her co-heirs have taken possession of the estate, and especially of the above described property, * * * that said estate is insolvent and said heirs have no interest therein;" and that it is necessary to annul the titles in the names of said Lavedan and Dupont, and to have said property, held by them, returned to said estate, and sold to pay the debts due to petitioners and intervenor," and they pray judgment accordingly.

By supplemental petition, it is alleged that after the confiscation of said property, H. M. Hyams made a simulated sale of it to I. S. Hyams, and that the simulation was declared by judgment rendered February 21st, 1878.

There were, originally, separate suits filed, against Lavedan and

Dupont, but they were afterwards consolidated, and the contest appears to be, now, concentrated upon the claim for the property held by Lavedan, a conclusion as to which will be determinative of all issues presented, and will serve as the basis for the judgment in the consolidated cases.

Defendants plead the prescription of. ten years, *liberandi causa;* of three months, and of three, five and ten years *acquirendi causa; res judicata,* and estoppel; and allege that their titles are valid, and that they have been ·in quiet possession under them for more than ten years.

We find that the following facts are either admitted or established beyond controversy, to-wit:

H. M. Hyams and his wife died in 1875; their successions were duly opened, in one proceeding; their son, I. S. Hyams, qualified as administrator, and, upon February 14th, 1877, filed a provisional account in which he recognized Ameron Ledoux and Mrs. Lewis as creditors, but did not mention the property in controversy in the present litigation, as belonging to the succession. This account was opposed by Mrs. Lewis and. by the Planters' Association, upon the ground, among others, that it did not set forth all the property belonging to the succession, and the opponents, in their oppositions, divided the property said to have been omitted into two classes, to-wit:

FIRST CLASS. Property which appeared to have been sold by H. M. Hyams to Isaac S. Hyams, his son, the sales, it was alleged, being simulated.

SECOND CLASS. Property which had belonged to H. M. Hyams, which had been confiscated and sold by the government, and which Isaac S. Hyams had bought from the purchasers at the confiscation sales; his purchases being ratified by H. M. Hyams. These purchases, it was alleged, were made for the use and benefit of said H. M. Hyams, and it was further alleged that the purchasers, at said confiscation sales, acquired only the ·life interest of said H. M. Hyams, and could sell no more than they had acquired; that neither their sales, nor the ratification of H. M. Hyams could convey title (in fee simple) to Isaac S. Hyams, but that, at the death of the confiscatee, the life estate, or usufruct, and title (in fee) became united and reverted to the estate of the confiscatee, and became subject to the claims of his creditors.

In this division, the property which is the subject of the present controversy is specified, and is included in the "First Class." The account was approved and homologated, so far as not opposed.

We note here, in order that it may appear in its chronological order, the following, as among the admissions agreed on by counsel, to-wit:

"On June 1, 1877, W. W. King appeared in court for Isaac S. Hyams and others, and took a rule to cancel the city and State taxes, and, in this rule, it was claimed that they were the sole heirs of Henry M. Hyams, and that, as such sole heirs, the property had reverted to them; and, on July 10, 1877, judgment was rendered on said rule cancelling the taxes, as prayed for."

Upon August 29, 1877, Isaac S. Hyams executed an act of renunciation, in which, after specifying certain pieces of property, including the property in controversy, he says, concerning it: "Having been confiscated and sold by the United States Government as that of H. M. Hyams, reverted, by the latter's death, exclusively to his heirs * * * in whose favor, therefore, the present holder, the undersigned, hereby renounces every claim or title to its ownership." This act was recorded in the mortgage and conveyance offices, August 30, 1877.

The oppositions of Mrs. Lewis and of the Planters' Association were not acted upon until February, 1878, when judgment was rendered for which the judge handed down his reasons in writing.

Referring to the property for which the movers had called upon the administrator to account, he said:

"It seems to me very clear that the properties of the first class, designated by opponents, belong still to the succession of H. M. Hyams. The sales thereof, made by the late H. M. Hyams to his son, I. S. Hyams, are shown to have been simulated. I do not believe that the Honorable Governor Hyams made them with a view of defrauding his creditors, but merely to place them, if possible, beyond the reach of the United States Government, through the confiscation laws. From the evidence on record, I judge that these sales were not intended to have any other effect, and that they must be taken as simulated, and the property must be inventoried or accounted for herein. Not so, however, with those of the second class, the decision of our Supreme Court notwithstanding. By the seizure, condemnation, and

sale of these properties, all estate or interest whatsoever, which the late H. M. Hyams had therein, was taken away from him. The purchase of these properties by I. S. Hyams from the purchasers at the confiscation sales did not vest the fee simple of the same in him. Those vendors could not give any such title. At the death of H. M. Hyams, his children took these properties, which were once his, by virtue of the statute and the express reservation in the Federal Constitution, and they can not now be brought in the succession of H. M. Hyams, through whom they do not descend to his heirs. They may be burdened with the debt of Hyams, Sr., contracted before their confiscation and sale. This I am not called on to determine. If they are, this is not the forum in which opponents can exercise the rights which they have. They must go before a court of ordinary jurisdiction. Such seems to me to be the import of the decisions of the Supreme Court of the United States on this subject matter."

The decree, in so far as it relates to the subject under consideration, reads as follows, to-wit:

"Declaring * * * the sales, described in said oppositions herein, made by the late H. M. Hyams to said I. S. Hyams, administrator, to be simulated and that the properties now form part of the estate of said H. M. Hyams, and that the said account be further amended by including the same in the assets of this succession, and that in all other respects, the said oppositions be dismissed."

This judgment was signed February 27th, 1878, and no appeal was taken therefrom. Shortly afterward, to-wit, March 22nd, 1878, Mrs. Lewis, through her counsel, took two rules on the administrator, the one to show cause why his property should not be "distrained until he complied with the judgment and order of court;" and the other to show cause "why execution should not issue against him, under which his property to a sufficient amount to pay said judgment in favor of relator should not be seized and sold."

Whilst these rules were pending, and, apparently, to enable the court to obtain information, which it needed in order to dispose of them intelligently, Mr. J. B. Gervais Arnoult was "appointed as expert to examine and report in writing, (1) What properties belonged to H. M. Hyams at the time proceedings for confiscation were entered against him in the United States Court."

"2. What properties belonging to him were actually confiscated in those proceedings.

"3.   What properties were actually seized by the marshal, under his writ of *venditioni exponas,* and,

"4.   What properties were actually sold thereunder by the marshal."

This expert made a report, which was homologated at the instance of the counsel representing Mrs. Lewis, August 12, 1878, and, upon September 18th, following, the two rules taken on behalf of Mrs. Lewis were dismissed, for reasons given in a written opinion in which the judge said, after stating that the demands for the writs of *distringas* and execution were conflicting: "Nor can either be issued.  For we have now ascertained what property belongs to the succession by the homologation of the expert's report under the judgment rendered by this court February 21st, 1878.   The administrator may easily be compelled, now, to inventory that property, and even if he refuses to do that, the sale of the same may be provoked for the purpose of paying the claim of the relator."

The report of the expert is not before us, but that he reported that the property which is here claimed had been confiscated and sold by the United States Government, and, hence, that it was held by the court not to belong to the succession, follows, necessarily, from the reasoning which led to the judgment on the oppositions; from the action of the court appointing an expert, for the purpose stated, and in homologating his report; and from the specific allegations already mentioned, and admissions of the plaintiffs and intervenor.  Thus, the following are distinct admissions, made at different times, during the progress of the trial, which we find in the record.

"It is admitted by all parties to this suit that the life interest to the property involved in this suit was confiscated by the United States Government, under decree of condemnation and sale, and was actually sold by the United States Marshal under such decree."

＊          ＊          ＊          ＊          ＊          ＊

"VIII.   On February 27, 1878, judgment, on the oppositions of the Planters' Bank and Mrs. Cammilla S. Lewis, was rendered, decreeing 'that all the property which had been confiscated did not form part of the succession of Henry M. Hyams (see judgment on oppositions and reasons for judgment, filed in the record), and that the simulated property did belong to it.' "

It is further admitted, not only that the property in question was not on the account filed by I. S. Hyams, February 14th, 1877, but

that it was never mentioned, "as an asset of the estate, in any of the other accounts filed," and was not included in either of the inventories filed in 1875, 1894, and 1896 respectively. And it is further admitted that I. S. Hyams, administrator, filed a second account, April 3rd, 1879, and a third May 29th, 1879, and that the account last mentioned was opposed by Ameron Ledoux. But, neither the account, the opposition, nor the judgment thereon are in the record, and the admissions do not inform us as to the purport of the opposition.

It is admitted that I. S. Hyams died in June, 1883, and that, in September of that year, his brother, Ingram R. Hyams qualified as administrator of the succession of H. M. Hyams and wife. It is further admitted:

"That, on April 24, 1884, in the suit entitled Hyams vs, Hyams, No. 11,245 of the Civil District Court, Division D., Henry M. Hyams and Ingram R. Hyams, two of the children and heirs of the late Henry M. Hyams, Sr., and wife, brought suit against the other heirs of the late Henry M. Hyams and wife, praying for a partition by limitation (?) (licitation) of the various pieces of property mentioned in the petition, including the property involved in this suit. In this petition, it is averred that, the above property having been confiscated and sold under Act of Congress, approved July 17th, 1862, in the suits Nos. 7685 and 8025 of the docket of the United States District Court of Louisiana, and, at the present time, in the name of I. S. Hyams by purchase of the confiscatee's title thereto, from various persons."

Judgment was rendered in this partition suit, and signed June 14, 1884. The partition was decreed, the property was ordered to be sold, separately, and the parties were referred to Eustis, notary, for the settlement of their respective claims, and the distribution of the proceeds. Agreeably to this judgment, the property in question was sold at public auction, by W. I. Hodgson, auctioneer, July 19th, 1884, and was adjudicated to Henry M. Hyams (son of the decedent) and Francis R. Wall, an undivided half interest to each, and acts of sale, pursuant to this adjudication were executed by the auctioneer, in favor of Henry M. Hyams and Francis R. Wall, the adjudicatees, February 13th, and March 5th, 1885, respectively.

Between the dates of the adjudication above recited and of the acts of sale confirmatory thereof; the inscriptions of the judgments in

favor of Amcron Ledoux and of Camilla S. Lewis, which had been recorded to operate as judicial mortgages against H. M. Hyams, were cancelled, as appears from the certificate of the recorder, upon September 16th, and December 27th, 1884, respectively, by virtue of orders of the Civil District Court, so that, at the time of the execution of the notarial acts of sale to H. M. Hyams, Jr., and Francis R. Wall, the judgments in favor of the plaintiffs and the intervenor were no longer inscribed as mortgages against H. M. Hyams, Sr.

The interest thus acquired by H. M. Hyams, Jr., was sold November 22nd, 1890, by Wm. R. Rutland, testamentary executor, at public auction, under an order of the court rendered in the matter of the succession of the said Hyams, and was adjudicated to Fergus Kernan; and an act of sale, in confirmation of said adjudication was executed by said Rutland, Executor, before S. G. Laycock, notary public, at Baton Rouge, April 9th, 1891.

The interest acquired in said property by Francis R. Wall was sold by him to Furgus Kernan by act before L. J. Weatherwax, a notary, at Aberdeen, in the State of Washington, February 18th, 1891, which act was registered in New Orleans, July 27th, 1893.

Kernan subsequently sold the property to Dickson, and Dickson sold to Lavedan, the defendant in this suit, by act of date October 24, 1893, and, concurrently with the execution of this act, Lavedan executed a waiver of warranty of title, which was registered upon the same day, and which reads as follows:

"Now, in consideration of the smallness of the price paid for said property, and the further consideration, that the said vendor has executed in my favor a bond with good and sufficient securities in the sum of five hundred dollars, by which he obligates himself to procure the cancellation of an outstanding title to a certain portion of the property conveyed; and in consideration of the fact that in the agreement for the sale of said property said conveyance was intended to be a quit claim deed, and to convey only such title as the vendor possessed, I do, by these presents, release said William A. Dickson and his vendor, Fergus Kernan, from any obligation of warranty stipulated in said act of sale to me, and from any and all obligation to warrant the title of said property (I, being fully acquainted with said title) except as against their own acts."

As to this waiver, and as to the possession of Lavedan and his

authors, we find in the record, the following evidence, to-wit: Mr. Ory testifying, says:

"I approved the title, except in so far as related to a number of tax inscriptions and adjudications to the city, which I knew existed against the property and were then in the course of cancellation in the case entitled Henry Charnock vs. The City of New Orleans."

This testimony was objected to, and the latter part of the witness' statement was excluded on the ground that a written instrument should speak for itself, unless there is some ambiguity in its terms which requires explanation. The witness then goes on to say: "I would state that Mr. Lavedan accepted the title entirely on that statement to him that the title was good and that he could take the same. He acted entirely upon my legal advice, and never has had any adverse opinion, by me, on the subject, as his attorney."

In this connection; it is admitted:

"That in August, 1893, Henry Charnock brought suit against the city of New Orleans, the State Tax Collector, and the Attorney General, to have all State taxes and all State tax sales and adjudications cancelled and annulled from the books of the conveyance office of this parish, and the suit was still pending when Dickson sold to Lavedan, on October 24th, 1893.

"William A. Dickson had intervened in the suit for cancellation and was a party thereto. Judgment in favor of the plaintiffs and intervenors, cancelling all tax inscriptions, was rendered on the twenty-third day of February, 1894, clearing the property of all tax adjudications and tax privileges."

Lavedan testifies as follows:

"Q. Did you have the title examined by any one?
"A. Yes, sir.
"Q. Involved in this case?
"A. Yes, sir.
"Q. What did the attorney report, that it was good or bad?
"A. That it was good.
"Q. How much did you pay for the property?
"A. $6000.00.
"Q. You purchased the property on his report?
"A. Yes, sir.

"CROSS-EXAMINATION.

"Q. By whom did you have the title examined?

"A. By Mr. Ory."

Upon the subject of the possession, Mr. Kernan says:

"A day or two after suit No. 17,057, (filed March 2, 1886,) of the docket of the Civil District Court, entitled, 'In re Thomas Behan,' was filed, the late H. M. Hyams, Jr., and myself were called on by the persons who were threatened with eviction by Thomas Behan in that suit, to defend their possession. The late H. M. Hyams, Jr., was approached in this connection, and afterward acted as representing his own undivided half interest in the Lavedan property—the property sued for, in this case, and I was called on, and so acted, as the representative of Francis R. Wall, claiming to be the owner of the other undivided half interest of the Lavedan property, the property described in this suit. At the solicitation of these people, who were thus threatened with eviction by said Thomas Behan in his application for a writ of possession under his tax title, under Act 82 of 1884, H. M. Hyams and myself, as attorneys of persons claiming to be the owners of the Lavedan property, the property involved in this suit, applied for and obtained a writ of injunction, for matters set forth in said petition which is made a part of this statement. These persons, at that time, were holding possession of the land as tenants of the late I. S. Hyams, one of the authors of H. M. Hyams, Jr., and F. R. Wall, and agreed, thereafter, to hold possession of said land as the tenants of H. M. Hyams, Jr., and F. R. Wall. Shortly after judgment was rendered in this suit, the said H. M. Hyams, Jr., F. R. Wall, and myself went to section 8, where these people were living, and made leases with them, which leases have never been terminated to my knowledge. All of these people, these tenants, were living on that portion of the land situated on the other side of the Claiborne Canal. Afterward, on December 24th, 1889, William R. Rutland, testamentary executor of the late H. M. Hyams, Jr,. and myself, put a wire fence around that portion of the Lavedan property situated between Claiborne street and its inside boundary towards the river, say, at Locust street (now South Robertson), since which time I have been in actual possession of that part of the land, as representing, first F. R. Wall and the estate of H. M. Hyams, Jr., and afterward as representing Leon Lavedan, and

during my time of possession as such representative, have rented it as a pasture, first, to Paul Bernard, and afterward to E. L. Rance. The persons who were in possession at the time of the above mentioned visit, made by the late H. M. Hyams, Jr., F. R. Wall and myself, are those whose names are mentioned on the slip of paper in the handwriting of the late H. M. Hyams, Jr., annexed to, and made part of, the statement marked "A." Some of those persons are dead; some of them were living on the land at the time of our visit; and, from last accounts, are living there yet, for example, James Wilson, Harrison Cooper, and William Page. In addition to the above, I will say that, immediately after the adjudication of the property to H. M. Hyams, Jr., and F. R. Wall, Hyams, Jr., and I went to the land and told as many of the occupants as we could find that we had bought the land; that they could occupy it and cultivate it, paying therefor, a nominal rent, which they all promised to do, and some did actually pay rent to Hyams, Jr., in vegetables. The land was, and is yet, swamp land, and the occupants were colored people, who raised vegetables, when their crops were not destroyed by overflow."

There are still other admissions and facts to be found in the transcript, which may be noted. It is admitted, by counsel for the administratrix and for the heirs, that the property herein claimed, belonged formerly to the late H. M. Hyams and Laura M. Hyams, his wife. But, so far as we are able to gather, from an unusually confused transcript, there was an undivided one-sixth interest in the property, which may have remained vested in George May, thus:

Thomas Winston sold the entire property to H. M. Hyams and George May, in the proportions of an undivided half interest to each. George May sold an undivided one-sixth, thus acquired, to his co-purchaser, Hyams; and another undivided one-sixth to Patrick Irwin. Irwin sold the one-sixth, thus acquired by him, to Beard, and Beard sold it to H. M. Hyams, Sr.

But, if May ever parted with the other one-sixth interest which he had acquired from Winston, this record fails to show it. H. M. Hyams, Sr., as it thus appears, acquired five-sixths interest in the property, and the other one-sixth, for aught that appears here, remained vested in May.

Nevertheless, Beard, who had already sold to H. M. Hyams the one-sixth which he had acquired from Irwin, and which, so far as the record discloses, was the only interest which he ever acquired

NEW ORLEANS, JANUARY, 1900.  345

He rs of Ledoux vs. Lavedan et als.

from any one, at a later period, after the death of H. M. Hyams, Sr., undertook to make over to Isaac S. Hyams, by way of an exchange, still another one-sixth interest in the property in question.

In 1867, after the confiscation proceedings against him, and before the amnesty proclamation, H. M. Hyams, Sr., executed an act of sale, to Koskiusko R. Hyams, of the one-third, or two-sixths interest in the property, which he had acquired from May and Beard.

The act from H. M. Hyams, Sr., to Isaac S. Hyams, executed before Cuvellier, notary, May 4, 1866, does not include the Lavedan property, though apparently offered for the purpose of showing that said property was sold by H. M. Hyams, Sr., to Isaac S. Hyams.

It has already been stated that, upon August 30th, 1877, Isaac S. Hyams executed and placed on record, an act of renunciation, in which he declared that this, and other property, had been confiscated as against H. M. Hyams, Sr., and, upon the death of the latter, reverted to his heirs, in whose favor he renounced, but it does not appear from this instrument, from whom he acquired the title thus renounced.

The record further shows that, upon May 22, 1884, by an act before Fergus Kernan, notary, Ingram R. Hyams conveyed a one-sixth interest in the property in question to F. R. Wall, the act containing this recital; "the same being the share acquired by the present vendor by reversion, by reason of the confiscation of an undivided half interest by the United States Government (title unrecorded) and by reason of the renunciation of Isaac S. Hyams of the other undivided half, conveyed to him by his father, Henry M. Hyams, January 2, 1868, ————————one-sixth of the said property being the share inherited by the present vendor from his brother, Richard Hyams, who died intestate in February, 1879," etc.

In June, 1894, Laura R. Hyams (a daughter of Henry M. Hyams, Jr.,) became administratrix of the succession of her grandparents, and, upon August 31, 1896 (as Mrs. Laura R. Hyams Thomas), filed an account, upon which she did not specifically mention either the claim of the plaintiff, or the claim of the intervenor, nor did she place thereon the property in question. The account, however, contained the recital: "It is proposed to pay the balance shown on this account to F. L. Richardson, attorney, as representing the only known creditor of this estate." And this account was homologated without opposition. Another account was filed by her, September

9th, 1897, and likewise homologated. The present suit had, however, in the meanwhile, been filed, March 23rd, 1896.

## OPINION.

It will be seen from the report of this case, upon its first hearing in this court (see 49th Ann., 913), that the question was considered, whether the judgment of the late Second District Court, rendered upon the opposition of Mrs. Camilla S. Lewis, the transferor of the present intervenor, demanding that the property in question should be brought into the succession of H. M. Hyams, did not constitute *res adjudicata*, as to the present demands, as well as of plaintiffs as of the intervenor, and it was held in substance, that the plea (of *res adjudicata*) was good, as against the intervenor, provided the property here claimed could be identified as confiscated property, since the judge of the Second District Court had decided that confiscated property, did not belong to, and should not be brought into, the succession. The following extracts from the opinion of this court will serve to present the matter clearly. It was said:

"There is a disagreement among counsel as to what property is involved in this litigation. No deed containing a description of property has been introduced in evidence, and no attempt at identification of property by evidence was made. All the property designated as property of the "first class" is not clearly identified. The same is true of the property designated as property of the "second class;" *i. e.,* the property which had been confiscated, does not appear to have been segregated from the property which was not confiscated. The difference as to the two, as to title, was a subject of argument at the bar. We have seen that the judgment rendered in 1878 decreed the first—the property of the first class, property of the succession, and dismissed the opposition as to the property of the second class. With the evidence before us, and in view of the allegation made in the pleadings, we can not determine, with any degree of accuracy, what property is included in the first class and what property is in the second class. We will, notwithstanding, pass upon the issue of law involved."

And the court proceeded to hold; that the Second District Court had jurisdiction to determine the issues presented by the opposition of Mrs. Camilla S. Lewis; that Mrs. Lewis had authority to stand

in judgment for the purposes of that opposition; that she had invoked the jurisdiction of the court; that she had not appealed from the judgment rendered; that she was bound by that judgment; and that it constituted *res adjudicata,* against any claim which might be set up by her transferee, affecting property belonging to the second class. Upon application to modify the decree, it was said, as it had before been said, in substance, "we have, in view of conflicting allegations in the pleadings, and insufficiency of the evidence, declined to determine whether the properties involved belonged to the first or second class."

The case now comes up to us, with the pleadings still containing the allegation that "the lifetime interest in said property was confiscated and sold," but amended to the extent that it is now alleged "that, after the confiscation of the life estate in and to the property herein claimed, as set forth in the original petition, the deceased H. M. Hyams caused a simulated sale to be made of said property to I. S. Hyams, also deceased. That said simulation was declared by judgment of this Honorable Court, as will more fully appear by reference to a copy of said judgment and the reasons thereto attached, herein filed. That said property was ordered to be restored to said succession, but said judgment has never been carried into effect."

The judgment thus referred to, the reasons for the judgment, and the opposition which provoked it, in which latter the classification of the property was made, are all to be found in the transcript previously filed. Nevertheless, as the plaintiffs and intervenor alleged specifically, that the property claimed by them was confiscated property, whilst from the classification, in the opposition, it was ranked as property which had not been confiscated, but had been, as was said by the judge of the Second District Court, in his reasons for judgment—covered with a simulated title, merely to place it "if possible, beyond the reach of the United States Government, through the confiscation laws," it was held that it was not sufficiently identified, and the case was left open upon that, and other points. .

On the present appeal, we have, it is true, the amendment to the pleadings, which has just been mentioned, but, upon the other hand, we have also, a repetition of the allegation, in the amendment itself, together with distinct admissions made in the course of the trial, that this particular property was confiscated and sold by the United

States Government; and, beyond this, we have the fact, disclosed in the present record, that the judge of the Second District Court did not, himself, consider the classification in the opposition of Mrs. Lewis as identifying the property and fixing its status for the purposes of the judgment rendered by him on that opposition. For, he, thereafter, appointed an expert to examine, and report in writing:

"1. What properties belonged to H. M. Hyams at the time proceedings for confiscation were entered against him, in the United States Court.

"2. What properties belonging to him were actually confiscated in those proceedings.

"3. What properties were actually seized by the marshal, under his writ of *venditioni exponas,* and,

"4. What properties were actually sold thereunder by the marshal."

The report of this expert was homologated, as the record shows, upon the motion of the counsel representing Mrs. Lewis, and it was that report, thus homologated, which was regarded as identifying and differentiating the property for the purposes of the judgment on the opposition. That this is true, is apparent from the language used by the judge, in dismissing the rules taken by Mrs. Lewis for writs of *distringas* and execution, for, he says, referring to said writs:

"Nor can either be issued. For we have now ascertained what property belongs to the succession, by the homologation of the expert's report, under judgment rendered by this court * * * the administrator may easily be compelled, now, to inventory that property, and, even if he refuses to do that, the sale of the same may be provoked for the purpose of paying the claim of the relator."

If, the opponent had any objection to urge, to the effect that (by the appointment of an expert, for the purpose stated, and by the homologation of his report, which determined what properties, included in the two classes mentioned in the opposition, belonged to the succession, and what did not), the court was placing an unauthorized construction on the judgment which had been rendered on her opposition, she ought to have urged such objection at the time. Instead of doing so, however, she, through her counsel, moved to homologate the expert's report, thus acquiescing in the construction which the judge placed upon his own judgment. And, in the record

before us, we find an admission, made for the purposes of the present trial, indicating a continued acquiescence in that construction. It has already been cited in this opinion, and reads:

"VIII. On February 27th, 1878, judgment on the oppositions of the Planters' Bank and Mrs. Camilla S. Lewis was rendered, decreeing that all property which had been confiscated did not form part of the succession of Henry M. Hyams (see judgment on oppositions and *reasons for judgment,* filed in the record), and that the simulated property did belong to it."

(The italics are ours).

The construction placed by the judge who rendered it, upon the judgment on the oppositions of the Planters' Bank and Mrs. Lewis, was itself, in the form of a judicial proceeding, resulting in a judgment, invoked by Mrs. Lewis and acquiesced in by her. It is too late for her transferee, now, to claim that the judgment thus construed spoke for itself, and that the judge was without authority to interpret it, as he did, and, as Mrs. Lewis herself, and the intervenor, her transferee, have continued to interpret it, for more than twenty years.

We, therefore, conclude that, it being admitted that the property here claimed was among that property of the late H. M. Hyams which was confiscated and sold, said property fell into the class which, in the contemplation of the judgment of the Second District Court, upon the opposition of the intervenor's transferor, did not belong to the succession of said Hyams and was excluded therefrom by said judgment; and hence, that the plea of *res adjudicata,* heretofore maintained by this court as against the claims of the intervenor applies to said property, and cuts the intervenor off from the further prosecution of the claim here asserted.

As to the claim of the plaintiffs, it was held in the original judgment of this court, for reasons which need not here be recapitulated, that the judgment upon the opposition of the Planters' Bank and of Mrs. Lewis did not constitute *res adjudicata.* Otherwise, said claim comes before us upon this second appeal, upon all the issues presented by the pleadings. And the judgment heretofore rendered, and with respect to which the rehearing was granted, was given for the defendants upon the grounds, that the confiscation of the property left the title *in nubibus* until the death of the confiscatee, when

it reverted to the heirs; the following qualifications, however, being added, to-wit:

"But, if this be considered a doubtful proposition, it seems perfectly clear that the creditors of the confiscatee having acquiesced in the possession of the heirs, through a long series of years, without question or complaint, are equitably barred and estopped from disturbing titles derived from them."

In discussing the ground last above mentioned, the counsel for the plaintiffs, in their brief for rehearing, say:

"There was on record the claim and judgment to this section 8, decreeing that the succession owned it. There was no actual possession within the prescriptible period of ten years. See R. No. 2, pp. 30, 110, 111. There was the waiver of warranty, p. 100, doing away with the good faith necessary for this prescription. There was a vile price paid by the heirs for property worth $6000, which was the amount afterward paid by the defendant, Lavedan."

Considering these propositions in the order in which they are stated, we have, in this opinion, already reached the conclusion, and given the reasons therefor, that there has been on record since 1878 no claim to the property in question as a succession property, and no judgment decreeing it to be such. We think that the judgment, as rendered upon the opposition of the Planters' Bank and Mrs. Lewis, was construed by the judge who rendered it (in another judgment of equal force and effect and of a later date), to exclude said property from the succession, and that said construction was invoked and has been acquiesced in, by the parties interested, for more than twenty years, and that it is now too late for them to question either its authority or its correctness. But, in any event, how can the plaintiffs, who, by the judgment of this court rendered upon the first appeal, were sustained in the position that the judgment which they invoke was of no binding effect as against them, now claim it to be binding, in their favor, as against the other parties to this litigation?

Upon the question of possession, we are referred to Record No. 2, pp. 30, 110, 111. Referring to those pages, we find:

Page 30. The testimony of Mr. Ory, who states, that there is a little shanty on the property, which was there before Lavedan's acquisition, but how long before he does not know; and that "there is also a barbed wire fence around this property which has been there for

seven or eight years," put up, as he believes, by one of the tenants of Mr. Hyams or Mr. Kernan. Pages 110, 111. We here find the testimony of Mr. Kernan, which has already been quoted, *in extenso,* and in which he says, among other things;

"In addition, I will say, that immediately after the adjudication of the property to H. M. Hyams, Jr., and F. R. Wall, Hyams, Jr., and I, went to the land and told as many of the occupants as we could find that we had bought the land, that they could occupy it and cultivate it, paying therefor, a nominal rent, which they all promised to do, and some did actually pay rent to Hyams, Jr., in vegetables. The land was then, and is yet, swamp land, and the occupants were colored people who raised vegetables when their crops were not destroyed by overflow." He further testifies that he acted as the representative of F. R. Wall and of the estate of H. M. Hyams, Jr., and, later, of Lavedan; that a few days after the 2nd March, 1886, he was called on to defend the possession of the property as against an attack by Thomas Behan, who claimed possession, under a tax title, and that he sued out an injunction, which was subsequently maintained; and that in December, 1889, he and Rutland, the executor of H. M. Hyams, Jr., caused a wire fence to be built around the land.

We have seen that the adjudication to Hyams and Wall was made July 19, 1884, whereas the present action was not filed until March 23rd, 1896. So far, therefore, from its appearing, from the evidence to which we are referred (and there is no other evidence on the subject in the record), that there has been no possession by the defendants, it seems that they were enjoying and exercising the rights of owners in possession for nearly twelve years before the plaintiffs filed this suit.

It is said that there was a vile price paid by the heirs, to-wit, $300 for the property worth $6000, the latter amount having been paid by Lavedan. There is nothing in the record to show that this property, which is swamp land, was worth more than $300 in 1884, and still less is there anything to show that, as swamp land, the title to which was burdened with tax inscriptions and adjudications, any one could have been found, at that time, to pay $6000, or any considerable sum for it. If the contention, on behalf of the plaintiffs, that this property, under the judgment of the Second District Court, belonged to the succession of H. M. Hyams, their debtor, and that it was worth

$6000, be correct, the question naturally arises, why did they not have it brought into the succession and sold, and, if the administrator stood in their way, why did they not have it sold, to pay the debt due them, without his assistance. The judge having jurisdiction in the premises had said, as far back as September, 1878, "the administrator may easily be compelled, now, to inventory that property (*i. e.,* property belonging to the succession), and even if he refuses to do that, the sale of the same may be provoked for the purpose of paying the claim of the relator." It seems not unlikely that the question thus propounded is to be answered by saying, either, that the plaintiffs acquiesced in the view that this property did not belong to the succession of their debtor, or else, that it did not promise, at that time, to realize enough to pay the cost of an attempt to sell it. That, after the lapse of a decade or more, with tenants secured, and with a prospect of clearing it of tax inscriptions and adjudications, it should sell for $6000, does not prove that, without such advantages, it was worth more, when adjudicated to them, than Hyams and Wall paid for it. If it had been worth more, as it was sold at auction, it would probably have realized more.

It is urged that Lavedan's bad faith is evidenced by his waiver of warranty. The evidence fails to show that this waiver had anything to do with the title in so far as it is here attacked. Reference is made in the waiver to an outstanding title to a portion of the property, as to which the vendors were naturally unwilling to warrant; there were also tax inscriptions and adjudications, and with respect to these matters the purchaser is shown to have been put on his guard, to the extent at least, that his legal adviser was aware of their existence. But the latter testifies that he knew of no danger to arise as this claim has arisen, and apprehended none, and so advised his client. And he further testifies, being asked the question, that he does not think that the property, if put up for sale, would bring more than $5000 at this time (the time at which he gave his testimony). The outstanding title referred to, is, perhaps, the one-sixth interest which George May is not shown to have parted with.

The learned counsel for plaintiffs, in their briefs, denying that the plaintiffs have been guilty of laches, propound the question, "what single act can be pointed out as an estoppel?"

The evidence shows that Ameron Ledoux obtained judgment against H. M. Hyams, in May, 1866, and recorded it, June 2, 1868;

that, in February, 1876, he filed a suit to revive said judgment, which suit was transferred to the Civil District Court nearly twenty-one years later, to-wit, November, 1896, and remains untried up to the present time. So far as appears from the record, there has been no reinscription of the judgment since June 2, 1868; the original inscription has been cancelled, and certificates from the mortgage office fail to show said judgment, as a mortgage against H. M. Hyams or any one else. When the heirs of H. M. Hyams undertook to effect a judicial partition of the property here in controversy, outside of the succession, nearly six years had elapsed since the court having jurisdiction in the premises had rendered a judgment which (as we must conclude, for the reasons which have been stated) justified them in pursuing that course. During that time, no effort was made by the plaintiffs to recover their claim out of said property, nor did they even keep alive the judicial mortgage which might have been claimed to bear on it. For, whilst it may be true that prescription has not run as against their claim, upon the theory that the succession has been under administration, it is also true that the inscription of the mortgage perempted for lack of reinscription.

Sorrels vs. Stamper, 27th Ann., 630.

Tilden vs. Succession of Morrison, 33rd Ann., 1067.

Succession of Myrick, 43rd Ann., 884.

The partition was ordered by a court of competent jurisdiction, the property was sold at public auction and adjudicated to the highest bidder, and, thereafter, during another period, of nearly twelve years, it was resold several times, until it finally came into the hands of the defendant, and, during all this time, nearly eighteen years, the plaintiffs remained silent, until the property, which had been worth practically nothing, had been sold to the defendant for $6000. They made no effort to have it sold in the succession, which they could readily have done if their theory as to its status is correct; nor did they make any effort to subject it to their claim, outside of the succession, but, on, the contrary, allowed the inscription of their judicial mortgage against all the property of their debtor to expire by limitation, so that it was cancelled, by order of court, as void and lifeless.

In Benedict vs. Bonnot, 39th Ann., 972, the *syllabus* reads: "If heirs and creditors remain silent and inactive, and permit the prop-

erty to pass, by a public sale, into the hands of strangers, purchasers and third persons accepting title from them are fully protected."

This doctrine was affirmed in Weil vs. Schwartz, 51 Ann., 1551, and finds abundant support in the authorities cited in the former opinion of this court on this, second, appeal.

These reasons would perhaps be sufficient for the purposes of the judgment to be rendered, but there are still other grounds upon which it might safely be placed, and which will be briefly considered.

We have seen that, as early as June 1, 1877, Isaac S. Hyams and others, appeared in court through W. W. King, Esq., their attorney, and took a rule, to cancel State and city taxes, in which "they claimed that they were sole heirs of Henry M. Hyams and that, as such sole heirs, the property had reverted to them; and on July 10, 1877, judgment was rendered on said rule, cancelling taxes as prayed for."

We have also seen that in 1884, there was a suit between the heirs for a partition of property which had belonged to Henry M. Hyams, and which, they claimed, had reverted to them upon his death, by reason of the fact that they were his heirs.

In Brashear vs. Connor, 29th Ann., 347, the *syllabus* reads: "The institution of a suit in the capacity of heir, * * * amounts to an acceptance of the succession, pure and simple," etc.

In Sevier vs. Gordon, 29th Ann., 440, the Succession of James G. Gordon was administered by the executor named in the will until 1867, and after that, by a dative executor. In the meanwhile, in December, 1868, two of the heirs brought suit against the others for a partition, and there was a partition accordingly. During this time, and afterward, John V. Sevier was prosecuting a claim upon which he obtained judgment, contradictorily with the dative executor, which judgment was affirmed by this court in 1870, the dative executor being discharged in 1871. Sevier then sued Mrs. Inez R. Gordon, the wife of John Gordon, one of the heirs (who, under a judgment of separation of property, had purchased his interest in the estate), to recover his virile share of the debt due him, upon the ground that, by purchasing her husband's interest, she assumed his portion of the debts of the succession.

In the opinion of the court, it was said, among other things: "In this case, the heirs provoked a partition and went into possession.

The succession thereupon ceased to exist. If there could be any doubt as to the effect of the demand for a judicial partition, the actual partition and the taking possession of the heirs of their respective shares constituted a plain and unequivocal acceptance; and the separation of patrimony was never demanded, nor was any security demanded of the heirs. The consequence is, that the creditors of the succession have become, thereby, the creditors of the heirs, each for his virile share, and they have the same .rights as any other, ordinary, creditors of the persons who are the heirs. These principles are elementary, and it was necessary to enunciate them, only to prepare the way for the consideration of the two grounds upon which the plaintiff relies."

"First. By the partition, * * * the specific part of the Verona Plantation, which fell to John Gordon, became absolutely his property, with the title vested in him. It was thenceforth liable to seizure by his creditors, without distinction; and it was seized * * * and sold * * * at the instance of his wife, his judgment creditor * * *. Plaintiff had no mortgage, no lien, no privilege, no right of preference on the property, etc."

In Succession of J. O. & Anne McCall, 28th Ann., 713, the successions, (husband's and wife's) were administered by one of the heirs, who, as heir, sued for a partition, and caused a *curator ad hoc* to be appointed to represent an absent brother. There was a sale of property, and a rule on purchasers to comply with their bids, and two of them defended, upon the ground, *inter alia,* "first: that the two successions were in course of administration and in possession of the administrator thereof, who had not tendered a final account, and a sale for partition could not therefore be made." The court said: "As to the first ground, we can see no good cause of apprehension, on the part of the purchasers. If the defendant in the partition is properly represented, the act of partitioning all the property is an acceptance of the succession", etc.

See also, Frazier vs. Hill, 5th Ann., 114; Scott vs. Briscoe, 36th Ann., 278; Benedict vs. Bonnot, 29th Ann., 972.

It seems clear from this, that the heirs of H. M. Hyams, Sr., including the administrator, had the right to make a partition of property of which they were unquestionably the owners, unless there was an objection and a demand, from the creditors, for administration thereof or for security, and, unless such demand, if made, was sus-

Heirs of Ledoux vs. Lavedan et als.

tained by the court. It seems also clear that the heirs, making such partition of succession property, became, personally, debtors, with respect to claims against the succession; but, the creditors of the succession, who were without mortgages or liens on the property sold to effect such partition, and who failed to demand a separation of patrimony, have no special rights or privileges, with regard to such property, which can affect titles in the hands of third persons, who have acquired from purchasers at the partition sale.

If the property, which was the subject of the partition sale, is to be regarded as not having belonged to the succession, but as having come to the heirs, through another channel, the case may be said to be stronger as against the plaintiffs. And, from either point of view, the title acquired at the partition sale, was a "just title", sufficient, when accompanied by possession, to constitute a basis for the prescription *acquirendi causa*.

Since there is, and can be, no denial, that, whether the title to the property vested in the heirs of H. M. Hyams, Sr., at his death, through his succession, or otherwise, and whether incumbered or free of incumbrance, it was a valid title, it follows that the parties to the partition, basing their respective claims thereon, needed no better title, as did the defendants in the case of Kernan vs. Baham, 45th Ann., 799, to which we have been referred. The testimony in the record, upon the subject of possession, being entirely uncontradicted, we think sufficient, as is the title, for the purposes of the prescription set up. These views render it unnecessary that we should again enter into the subject of the title to confiscated property during the life and at the death of the confiscatee.

We find the judgment of the lower court correct, and it is affirmed.

We concur in the decree on the ground of the prescription pleaded.

<div style="text-align: right">

N. C. BLANCHARD.

Jos. A. BREAUX.

NICHOLLS, C. J., recused.