## No. 13,668.

### WILLIS CURL vs. RUSTON STATE BANK.

#### SYLLABUS.

When a person has done or said something with intent to influence the dealings of another, and that other has acted upon the faith of it, the former ought not to be permitted to change it to the injury of the latter.

APPEAL from the Fourth Judicial District, Parish of Lincoln— Dawkins, J.

---

W. A. VanHook and Holbert & Barret for Plaintiff, Appellant.

Graham & Pearce for Defendant, Appellee.

---

The opinion of the court was delivered by

MONROE, J. In the matter of the "Ruston State Bank vs. S. A. Cameron et als," the plaintiffs caused to be seized, under a writ of execution, a certain cotton compress situated in the town of Ruston; whereupon Willis Curl brought this suit, injoining the seizure, alleging that he is the owner of said compress, and praying for the perpetuation of said injunction. The bank, defendant in injunction, admits that the seizure was made by its authority and proceeds to set forth at length its reasons for asking that the injunction thus issued be dissolved with damages, urging, among other matters, that the plaintiff in injunction

is estopped to set up the present claim. The facts disclosed by the record are substantially as follows, to-wit:

Some time in 1896, one S. A. Cameron visited Ruston, in the parish of Lincoln, and entered into an arrangement which, we infer, was rather tentative than definite, with some of the citizens, having in view the removal to that town of a cotton press, of which he claimed to be the owner, and which he represented as being at York Station in the State of Alabama. The exact nature of this agreement is not made apparent in the record, but, in February, 1897, Mr. Cameron wrote, from York Station, where he was living, to a Mr. Thompson, of Ruston, to the effect that he had raised $2500, himself, but needed as much more to move, erect and equip his press, and asking Mr. Thompson to get the Bank of Ruston to lend that amount, offering, as security, to "mortgage" the press and insure it, and also to place with the bank, as collateral, his "contract" with the citizens of Ruston. One or two other letters were written to the same effect, and, on the 22nd of March (1897), Cameron wrote to Thompson that he had received a letter from the president of the bank, from which he was hopeful that the desired loan would be made. We infer, however, that the bank and the citizens who were interested decided, before going further in the matter, to make some investigation at the Cameron end of the correspondence. Mr. Thompson, therefore, went to York Station to see Mr. Cameron. Upon his arrival, and as he was going, as he understood, in the direction of Cameron's house, he met an old man whom he did not then know, but who was, and is, Willis Curl, the plaintiff in the instant case and father-in-law of Cameron. Not being altogether sure of the location of Cameron's residence, Thompson asked Curl for information on the subject, and as there was more than one Cameron living at York Station, he particularly mentioned the fact that he was looking for the Cameron who owned the compress. Curl thereupon directed him to the residence of his (Curl's) son-in-law, S. A. Cameron, and said that "he guessed that he would have no trouble making a deal with that gentleman." Thompson then went to Cameron's home and entered into an agreement with him, as a result of which, shortly afterwards, Cameron visited Ruston and perfected arrangements for the raising of funds necessary for the removal of the press. Those arrangements were as follows, to-wit: A public meeting was held, at which it was stated that Cameron was the owner of the press located at York Station, Alabama, and the questions of the advisibility of removing it to Ruston, and of the ways and means, were discussed, with the result that an agreement

was reached in accordance with which Cameron made a note for
$2,620.14, dated July 7, 1897, payable to the order of the Ruston State
Bank, January 1, 1898, which note was also signed by certain citizens of
Ruston, as guarantors, and was identified with an authentic act, also
executed by Cameron, which, after reciting that Cameron owes the bank
$2,620.14, represented by the note already mentioned, proceeds thus:
"The said S. A. Cameron further declares   *   *   *   that in order to
" secure to the holders of the aforesaid note the payment thereof,
" together with interest, J. J. Booles, B. F. Thompson, A. A. Cann,
" Lewis & Co., Ltd., T. C. Standifer & Son, E. L. Kidd, W. L. Kendall,
" L. F. Marbury, J. Mack Smith, and Knowles Brothers, all residents of
" Lincoln parish,   *   *   *   have indorsed the said note, and made
" themselves guarantors for the payment thereof.   Now in order to
" secure the aforesaid indorsers, and to indemnify them against loss, in
" the event they shall have to pay the aforesaid note, or any part thereof,
" the said S. A. Cameron declares   *   *   *   that he does hereby pledge
" and pawn" certain property, which is described, including the cotton
press in question, of which W. D. Turrentine was put in possession, as
representing the pledgees.   And, upon this security, the bank discounted
the note and placed $2,500 to the credit of Cameron with the distinct
understanding, as between the maker of the note and the guarantors,
that the money was to be used exclusively for the purpose of removing
the press from York Station to Ruston, and erecting and putting it in
good running order in the latter place.   The evidence justifies the
belief that the greater part of the amount mentioned was used for the
purposes indicated, for the press was taken to Ruston and put in opera-
tion, with Cameron as manager, and his nephew, McElroy (who before
that time had lived at York Station), as book-keeper.   But, in accord-
ance with an understanding between Cameron and the plaintiff (which
really called for the payment of $1,500 to the latter), the plaintiff
received $450 of the amount thus advanced by the bank, though the fact
that he received that amount or that there was any reason for paying it
to him was entirely unknown as well to Cameron's guarantors as to the
bank.   Upon the contrary, during all this time there was no hint or
suggestion that any one else than Cameron owned or was interested in
the press.   He represented, throughout the negotiations, that he was the
owner, and he acted as such; and Mr. Curl, his father-in-law, not only
stood by and allowed him so to appear, but, as we have seen, directed
Mr. Thompson to him as the Cameron who owned the press, and with
whom Thompson would have no trouble in making a deal concerning it.

Proceeding with the narrative; late in the year 1897, within a month or two after the press had been erected, and whilst it was being operated under the management of Cameron, with Cameron's nephew, McElroy, as book-keeper, Curl paid a visit to Ruston, and during the few days, or perhaps, week that he was there, as the guest of Mr. Cameron, spent the greater part of his time either at Cameron's residence or at the cotton press. He, however, met and conversed with the president of the Ruston State Bank and made the acquaintance of several other citizens. During the period of his visit, as at all other times, Cameron was openly playing the role of owner of the press. It was in that ostensible capacity that he had brought it from Alabama, and had pledged it to secure the money borrowed in Ruston to pay the freight and charges incidental to its removal and re-erection, and it was in that ostensible capacity that he was managing it and holding himself out to the people of Ruston, and to the world at large, so publicly and notoriously, that no man situated as his father-in-law was, *i. e.,* an inmate of his house and a daily visitor and habitue of the press, could have failed to have become informed of his attitude in the matter. The evidence satisfies us that Mr. Curl said nothing in denial of the ownership thus openly asserted and acted on, but that, by silence, he acquiesced in the repre-- sentations made, and that he left the people of Ruston, as he had found them, believing, and with every reason to believe, that Cameron, and Cameron alone, was the owner of the press. But Cameron's manage- ment of the business of the press during the first season was unsatis- factory, for the reason that it did not result in paying the debt of the bank. In 1898, therefore, Dr. Booles, one of the guarantors, represent- ing the others, and with Cameron's consent (given, as he says, reluc- tantly and with conditions), took charge of the business and thereafter conducted it. In the meanwhile, Cameron was not altogether idle. He sold a half interest in the press to one Andom, who, in turn, appears to have conveyed such interest to the Merchants and Farmers Bank of Shreveport. He also purchased some property, on credit, and gave his notes for the price; and one of these notes came into the hands of C. P. Cooper as collateral security for a debt due him by a third person. Cooper brought suit and obtained judgment against Cameron on the note in question and seized the press under an execution issued thereon. And then, for the first time, Curl appeared upon the scene as a party in interest. In April, 1899, he filed a suit claiming to be the owner of the press, attacking the seizure of Cooper, and the adverse claim (under the transfer to Andom) of the Merchants and Farmers Bank, and praying

judgment decreeing him to be the owner of the press. And judgment to that effect was finally rendered in this court, in April, 1900. (Curl vs. Sheriff *et al.,* 52 Ann. 1052).

The claim thus made by Curl that he was the owner of the press, upon the basis of the ownership and pledge of which, in, and by, Cameron, the latter's note had been indorsed, and $2,500.00 in cash had been obtained, was a startling development, and there were probably indications that the indorsers contemplated taking proceedings for their own protection. To allay their apprehensions, Mr. J. W. Holbert, whom Curl had appointed his agent and attorney in the matter, upon May.4, 1899, wrote to Dr. Booles, as follows, to-wit: "I am authorized by Mr. " Curl, of York Station, Alabama, to say to you gentlemen who took " the pledge on the compress property that he fully recognizes the " pledge for the sum advanced, $2,500 (advanced on the strength of the " pledge), and trust that you will not incur any further cost in the mat- " ter." This was followed by a letter from Curl, himself, of date May 6, 1899, addressed to "Dr. J. J. Booles and others," which reads: "I " want you gentlemen to understand that I fully recognize the pledge " you have on my compress. I authorized the property to be pledged to " you gentlemen for $2,500. I don't think it would be honest in me to " try to beat it, even if I could. I fully indorse your action in taking " the pledge, and I shall carry out its terms."

The bank, however, was dissatisfied with the outlook, and in July, 1899, brought suit against Cameron and his indorsers, upon the note held by it, and, Cameron having removed from the State, the proceeding was begun by attachment, and a *curator ad hoc* was appointed to represent the absent defendant. Cameron, nevertheless, appeared by his attorney, W. A. VanHook, Esq., and by way of exception, and as a defence to the merits, set up that J. J. Booles, representing both the bank and the pledgees, had taken charge of the press and had managed the business, and that the revenues therefrom had been more than sufficient to pay the note held by said bank; and that, upon an accounting, there would be a balance due. He, therefore, prayed for the rejection of plaintiff's demand and for judgment, in reconvention, against the plaintiff bank, and against the pledgees of the press, for $2,400, or such sum as might be found due upon such accounting. Thereafter, there were some negotiations between J. W. Holbert, upon the one part, and Booles, or Judge Graham, upon the other, as representing the bank and, also, as representing the indorsers, with a view to having the bank and the indorsers suspend any active proceedings until the then pending

suit arising out of the seizure of the press by Cooper, should have been disposed of; and these negotiations resulted in a written agreement, of date November 1st, 1899, which reads as follows, to-wit: "It is this day " agreed between Willis Curl, herein represented by J. W. Holbert, his. " agent, and Dr. Booles and others, indorsers upon a certain pledged " note of S. A. Cameron, for upwards of $2,600 (as pledge on a certain " compress and fixtures, etc.) witnesses; that * * * Curl hereby, " and also S. A. Cameron, agrees to the following; recognizes all the " transactions of Dr. Booles and the Ruston State Bank in the receipts " and expenditures of the earnings of the press up to the beginning of " the season of 1899. Also recognizes all the legitimate debts of the " compress for all prior seasons to this and also the amount now due on " the said pledge note, as is shown by the note on file in the suit of the " Ruston State Bank vs. S. A. Cameron *et als*. And it is further agreed " that the press be run this season, or as long as profitable, and to hold " up all proceedings in court in said suit for said time, and it is also " agreed that a reasonable fee be allowed to the firm of Graham & " Pearce, attorneys, out of the earnings of the press. November 1, " 1899."

Judge Graham, explaining, as a witness, the purpose of this agreement, says: "Mr. Holbert, before our agreement, assured us, in positive " and unmistakable terms, that Curl had no resistance whatever to make " to the bank's debt, or to the pledgees, * * * the object of Mr. " Holbert was to secure a suspension of the proceedings until he could " have Curl's case" (meaning the case in which Curl claimed as against the Cooper seizure and the transfer to Andom)" decided in the Supreme " Court, and we consented to it." * * *

"I want to state further that if it had not been for that agreement we " would have gone on and would have gotten a judgment against Cam- " eron and the defendants in that case before the judgment was ren- " dered, on the 2nd of April, in which the Supreme Court said that Curl " was the owner. And, furthermore, we could, at any time, between the " 20th of July, 1900, and the 28th of April, 1899, have made Mr. Curl " a party to this suit, and we did not do that on account of our confi- " dence in Mr. Holbert and Mr. Curl, that they would keep their prom- " ises, and offer no resistance to our claims." This evidence is corroborated by that of Dr. Booles, and is entirely uncontradicted. Under the agreement to which it refers, further proceedings in the suit which had been instituted by the bank were suspended until April, 1900, (after the rendition in this court of the judgment in which Curl was declared

to be the owner of the press), when the parties proceeded with the trial and there was judgment in favor of the bank and against Cameron and his indorsers, *in solido,* for the amount of the face of the note, $2,620.14, with interest, less two credits amounting in the aggregate to $1,472.43, together with attorney's fees, and sustaining the attachment and rejecting the reconventional demand set up by Cameron, as in case of non-suit, with a reservation of his rights as against his co-defendants. And from the judgment so rendered no appeal appears to have been taken. When, however, the plaintiff undertook to execute said judgment, by a seizure and sale of the press, as the property of Cameron, Mr. Curl filed the present suit, injoining the sale, upon the ground that the property seized belongs to him and is not liable to seizure for the debts of the defendant in execution.

Before proceeding to announce any conclusion from the facts, as found in the foregoing statement, it is proper that we should notice what may, perhaps, be considered as attempts to controvert some of the facts as thus found. Thus, Mr. Curl undertakes to make it appear by his testimony, that, while visiting Ruston, he informed different persons that he, and not his son-in-law, was the owner of the press, but not a single witness was produced to corroborate this testimony, whilst the president of the Ruston Bank, and others who met him and were interested in the matter, testify that they never heard, until long after his visit and only when the press had been seized as the property of Cameron, that he claimed to be the owner. McElroy, the nephew of Cameron, who had come from York Station and had been given the position of book-keeper in the press, says that Curl passed a good deal of his time at the press, but never hinted that he had any proprietary interest in it. His testimony is as follows: "He was around there, I had a talk with him every few days while he was here. He came down there and sat around occasionally. Q.—What knowledge had you of any ownership of the compress on his part? A.—I did not have any. Q.—What inquiries did he make into the business affairs of the compress to indicate ownership? A.—He did not make any into the press or the books, or any thing. Q.—Who did Mr. Cameron say was the owner of the press? A.—He said he was." Mr. Curl also undertook to make it appear that he claimed to be the owner, and so acted, in the original negotiations and agreement for the removal of the press from York Station to Ruston. Thus, in testifying in the instant case, he says: "The reason why I permitted my compress to be removed to Ruston, Louisiana, was that it was a better location  *  *  *  The people of

Ruston, Louisiana, made what I consider a good proposition to me for the location of it there, at the instance of Cameron, and I consented for it to be moved there and operated (I did not authorize Cameron to pledge it there, I pledged it there myself as part of the contract which I made with the people of Ruston to move it there and operate it).

   \*       \*       \*       \*       \*       \*       \*

"Cameron did not pledge the compress to the people of Ruston to raise the necessary funds to move it from York Station, Alabama, to Ruston, I did that, myself, in order to get the compress moved there. \* \* \* I did not authorize Cameron to pledge it to anyone. \* \* \* All the negotiations preparatory to having it moved were had with me direct by the people of Ruston, and I made the contract with them to have it moved there. All that Cameron had to do with the moving of the compress, so far as I was concerned, was to suggest the proposition to move it and to bring this proposition to my attention in connection with putting the people of Ruston in communication with me in relation thereto. As I have said, the contract for moving the compress to Ruston was made by me on my own responsibility, on the representations made to me by Cameron and the people of Louisiana."

The statements thus made are repeated by the witness over and over again. And yet, whereas, for the purposes of this case, he says that he "did not authorize Cameron to pledge" the press; not many months before, in the suit in which he claimed the press as against Cooper, and the transferree of Andom, entitled Curl vs. Sheriff *et als.* (appealed to this court, and reported in the 52 Ann., 1052), referring to the press, he had sworn as follows: "When the said property was moved from York Station, Alabama, to Ruston, Louisiana, I gave S. A. Cameron the right and power to pledge it to the people of Louisiana, to secure the payment of a loan for $2,500, which sum of money was advanced by the bank at Ruston, Louisiana;" and there was introduced into the case on behalf of the plaintiff, an instrument purporting to be a written grant of authority from the plaintiff to Cameron authorizing the latter to pledge the press, which instrument, although bearing date August 5th, 1897 (about the time of the removal of the press from York Station), had never been acted on by Cameron, had never been heard of in Louisiana, and was thus produced, in 1899, to support the claim, then set up for the first time, that Curl was the owner of the press, which, for two years, Cameron had been allowed to deal with as his own. Curl swears, in the instant case, "Cameron did not pledge the compress. I did that myself;"

and yet we have in the record Curl's written authority to Cameron to pledge the press; the written, authentic, act of pledge, executed by Cameron; the sworn acknowledgment of Curl that Cameron did pledge the press and the written ratification of the pledge, as thus made, by both Curl and his agent or attorney. He swears that the people of Ruston negotiated directly with him with regard to the removal of the press from York Station, but he does not give the name of an individual who ever spoke to him on the subject. He does not pretend ever to have visited Ruston before the press was erected at that place, or to have had any correspondence with any one living there before that time. And there is no suggestion in the record that any one from Ruston, except B. F. Thompson, ever visited York Station upon that, or any other, business. And Thompson testifies positively, and without contradiction, that Curl then directed him to Cameron as the man who owned the press, and who would deal with him concerning it, and that he dealt with Cameron, and Cameron alone, and in this he is entirely corrobor- ated by Cameron, and by "all the people of Ruston," who had interested themselves in the matter of the removal of the press, and who were called on to testify; the fact being that the note held by the Ruston State Bank was executed by Cameron and indorsed by the citizens of Ruston immediately after a town meeting at which Cameron had repre- sented that he was the owner of the press. The palpable contradictions and gross mis-statements in the sworn testimony of the plaintiff, which have thus been noted, may find their explanation in the fact that the witness is past eighty years of age, and is, possibly, suffering from impaired memory, as an infirmity attendant upon the weight of years. Be that as it may, his testimony is of little or no value. No doubt, he owned the press at one time, as is shown by documentary evidence. But it is equally beyond question that he either made the title over to Cameron, who had married his daughter, or else that, without a formal conveyance, he placed the press at Cameron's disposal to make use of as his own, and that he held Cameron out, and allowed him to hold himself out, to be the owner, from the beginning of the negotiations, which led to the removal of the press to Ruston to the moment when he found it necessary to make a claim as against the seizure by Cooper and the transfer to the Shreveport Bank.

In view of these facts, the defendant in injunction now urges that, the plaintiff having held Cameron out, and having acquiesced in his appearing and acting, as the owner of the press, and having thereby enabled him to borrow the money which the defendant is seeking to

recover, is estopped now, and in order to defeat such recovery, to deny the truth of that which, by his declarations and conduct, he had thus previously asserted and acquiesced in. And defendant further urges that the plaintiff, in order to obtain a delay of legal proceedings on the part of this defendant, having admitted the correctness of the claim as sued on by this defendant, and having admitted that the press is liable for said claim, is estopped at this time, and after having obtained such delay, to deny the correctness of said claim, or the liability therefor of said press.

We find no answer to these contentions either in the record or in the argument of plaintiff's counsel. By plaintiff's own categorical admissions, notwithstanding his denials under oath, he authorized Cameron to pledge the press in order to borrow from the Ruston State Bank, defendant herein, the money needed for the removal and equipment of said press. And, from his declarations and conduct, equally expressive, when considered in connection with the declarations and conduct of Cameron, the conclusion is inevitable that he intended that, in so pledging and borrowing, Cameron should stand towards the bank as the principal in the transaction and as the owner of the property to be pledged. As a matter of fact, Cameron did stand towards the bank as the principal, and only party in interest, and as the sole owner of the press, and in that capacity, and mainly upon the faith of that ownership, obtained from the bank, defendant in injunction, the money which it is now seeking to recover.

It is true that the press is pledged directly to the guarantors of the note executed by Cameron in acknowledgment of the loan made by the bank. And by reason of this circumstance the counsel for the plaintiff in injunction argues that the purpose of the pledge having been to indemnify the guarantors in the event of their being compelled actually to pay the note, the guarantors alone have the right to resort to the pledge, and this only after they have paid the note. The answer to this is that, from the first, the press was held out as the property of Cameron which would afford security to the bank for the loan which it was asked to make. In Cameron's first letter to Thompson, asking him to assist in obtaining the loan from the bank, he wrote: "I want you to do me the special favor to see the bank and see if they will lend me the remaining $2,500, so I can go to work at once removing my press. I will give them mortgage on press and will carry insurance to cover this amount." Subsequently, when the loan was made and the notarial act was executed by Cameron, said act not only embraced the specific pledge

of the press to the guarantors of the note, to indemnify them in the event of their being compelled to pay their said note, but it also included the recognition and acknowledgment of the debt to the bank as evidenced by said note. In fact, this latter is the first, and, it may be said, the principal, declaration in the act. It is not surprising, therefore, that, when the agent of the plaintiff, who is also his counsel, and the attorneys for the bank, some two years later, entered into the agreement which had been referred to, the following language should have been used, to-wit: "It is this day agreed between Willis Curl, herein represented by J. W. Holbert, as agent, and Dr. Booles, and others, indorsers of a certain *pledged note* of S. A. Cameron, for upwards of $2,600 (as pledge on a certain compress and fixtures, etc.) * * * that the * * * Curl and also S. A. Cameron, agree to the following; recognizes all transactions of Dr. Booles and the Ruston State Bank in the receipts and expenditures of the earnings of the press up to the beginning of the season of 1899. Also recognizes all legitimate debts of the compress for all prior seasons to this and also the amount now due on the *said pledge note,* as is shown by the note on file in the suit of Ruston State Bank vs. S. A. Cameron *et als.* * * * *" This agreement indicates, as the language which we have italicized plainly shows, that the notarial act, executed by Cameron, was regarded not only as intended to indemnify the guarantors of the note, but as securing the note in the hands of the holder by whom the money had been loaned. Whether, technically speaking, it could be held to operate as a pledge to the bank as well as to the guarantors, is immaterial. It is sufficient for the purposes of the present question that it shows that, in the estimation of all parties, the press, as the property of Cameron, was regarded as securing Cameron's note in the hands of the holder. And, for the reasons which have been stated, it does not lie in the mouth of the plaintiff in injunction, at this time, to assert the contrary.

The same reasoning is applicable to the attitude which the plaintiff in injunction now assumes when considered in connection with the agreement of November 1, 1899, from which the foregoing quotation has been made. It will be remembered that Cameron had made a title to an undivided half interest in the press to one Andom, who had transferred the same to the Merchants and Farmers Bank of Shreveport; and Cooper, having obtained a judgment against Cameron, had seized the other undivided half interest under execution. Curl, the plaintiff now before the court, had then disclosed himself and, asserting that he was the owner of the press, filed a suit against Cooper and the Shreve-

port Bank, in which he prayed that he be so decreed. Thereupon the present defendant filed suit against Cameron and his guarantors, and it was in order that proceedings in the suit thus filed should be suspended until the question of Curl's claim as against Cooper and the Shreveport Bank should be determined that the plaintiff, Curl, through his agent, made the agreement in question, as the result of which the defendant suspended the prosecution of its suit until Curl had obtained a final judgment 'n his favor in the suit which he had instituted. When that had been accomplished, however, the defendant proceeded, obtained judgment and seized the press, whereupon the plaintiff instituted the present proceeding, injoining the seizure upon the grounds that the property seized belongs to him, and not to the defendant in execution; "that he owes the plaintiff bank nothing, and never made or entered into any contract with said bank whereby he became liable to it in any amount whatever. * * * That the said plaintiff bank has no pledge or privilege of any nature whatsoever on the said property herein claimed by your petitioner," etc. These averments are entirely irreconcilable with the declarations and admissions previously made, upon the faith of which the defendant in injunction had been induced to stay proceedings. As for instance the following, to-wit: "Also recognizes the amount now due on the said pledge note, as is shown by the note on file in suit of Ruston State Bank vs. S. A. Cameron *et als.* to be found in the agreement of November 1st, 1899." And the plaintiff is therefore estopped to urge such averments, upon the "principle of natural justice, that when a person has done or said something with intent to influence the dealing of another, and that other has acted on the faith of it, the former ought not to be permitted to change it to the injury of the latter."

It may be remarked that, in the suit brought by the defendant in injunction against Cameron and the guarantors of the note, Cameron was represented by the same counsel who represented him in the suit, to which he was party defendant, brought by Curl against Cooper and the Shreveport Bank, and who is also one of the counsel representing Curl, as plaintiff in the present action. On behalf of Cameron, in the suit in which the present defendant was plaintiff, he made quite a vigorous defence, and the judgment rendered reserved to his client certain rights. In the suit in which Cameron's father-in-law was plaintiff, he accepted service, waived citation, and co-operated with the plaintiff in the obtention of his judgment. These facts are noted as indicating that Cameron, as the principal actor in the matter, speaking

for himself and as owner of the property involved, has had a fair oppor-
tunity to present any defence to the claim of the defendant in injunc-
tion of which he was advised, and that he has availed himself of that
opportunity. As to the plaintiff, now before the court, he is a stranger
to the defendant in injunction, *quoad* the issues and the property
involved; and, for the purposes of this suit, is estopped to intermeddle
with either. The fact that, in another suit, between other litigants, pre-
senting other issues and different facts, he was held to be the owner of
such property, cannot affect the determination of the questions which
are presented here. From this point of view, it would be illogical to
hold him liable, upon the reconventional demand set up by the defend-
ant in injunction, as the principal obligor *quoad* the defendant's claim.
The judgment appealed from dissolves the injunction, recognizes the
right of the defendant in injunction to proceed with its execution and
cause the press, which is the subject of the controversy, to be sold in
satisfaction thereof, and condemns the plaintiff in injunction to pay
$50 in the way of damages for attorney's fees. Considering the prayer
of the defendant's answer and demand in reconvention we are of
opinion that the judgment meets the requirements of the case. It is
therefore affirmed.

Rehearing refused.