**SHREVEPORT PACKING CO., Inc., et al. v. MARRS.**

**HICKS CO., Limited, v. SAME.**

**Nos. 5567, 5570.**

Court of Appeal of Louisiana. Second Circuit.

Jan. 28, 1938.

Rehearing Denied March 8, 1938.

Dickson & Denny, of Shreveport, for Shreveport Packing Co., Inc., et al.

W. M. Phillips and D. H. Perkins, both of Shreveport, for Hicks Co., Ltd.

Cook, Cook & Egan, of Shreveport, for appellee.

TALIAFERRO, Judge.

These cases were consolidated for trial in the lower court and here. In each, plaintiff sues to recover an alleged balance due on open account. Hicks Company, Limited, sues for $1,608.14. Its account embraces the period from December 11, 1936, to January 23, 1937. The Shreveport Packing Company, Inc., sues for $420.41. Its account covers the period from December 10, 1936, to January 2, 1937. In each petition it is alleged that defendant, Mrs. W. G. Marrs, is the owner and operator of Marrs' Grocery and Market, in the city of Shreveport, and that she conducts said business separate from her husband. In each case, defendant articulately denied plaintiff's allegations. However, there is an admission by defendant in the note of evidence that as to amounts the accounts are correct.

During the progress of trial, each plaintiff filed a plea of estoppel against defendant's contention that her husband, and not she, is the true debtor. The demands in both suits were rejected. Plaintiffs prosecute separate appeal.

The plea of estoppel in the Hicks case is here quoted:

"Now comes the plaintiff, The Hicks Company, Ltd., and with respect shows to the Court that defendant in said above cause is estopped to deny her liability to plaintiff for said amount claimed in this suit for the reasons that said defendant represented to plaintiff that she was owner of the business conducted under the name of Marrs Grocery and Market, and that she would pay said account for all merchandise sold to said Marrs Grocery and Market by plaintiff, and for the merchandise the amount of which is sued for in the above numbered and entitled cause, and that she, said defendant, represented to your plaintiff not only that she would pay said account, but that she was well able financially to pay same, all of which said statements of said defendant your plaintiff relied upon in making the sale of said merchandise to said defendant, Mrs. Beulah B. Marrs, and extending the credit to her for said merchandise sold and delivered to her and for which judgment is sought in the above numbered and entitled cause, and that said Mrs. Beulah B. Marrs, defendant herein, is now estopped to deny that she was sole owner of said business of Marrs Grocery and Market under which name she did business during the time that said merchandise was sold to her, and is now estopped to deny personal liability for the amount sued for in this suit, being the purchase price which she agreed to pay for said merchandise and for the account herein sued on, said estoppel being hereby especially pleaded."

The plea in the Packing Company case is of same wording, substantially.

These suits, as developed by answers and testimony, propound an original and two alternative propositions as regards liability of defendant, viz.: (1) That the accounts are her direct obligations because she was the owner of the Marrs' Grocery and Market when the obligations arose; (2) that, even though she was not such owner, nevertheless she may be held liable for payment of the accounts, and is estopped to deny such liability, because she held herself out as owner; (3) that she promised to pay the accounts.

Prior to February 26, 1936, W. G. Marrs, husband of defendant, conducted a retail jewelry business at 211 Texas street in the city of Shreveport; and on this date added a line of retail groceries. Defendant loaned him $900 to enable him to put in the stock of groceries. Some thirty days thereafter, he adopted the trade-name "Marrs Grocery & Market," moved the en-

tire business twice, and finally leased and occupied a building at corner of Spring and Texas streets in said city. Marrs appears to have had limited capital and from time to time borrowed from his wife various amounts, the total of which was around $4,000. Some portion of this amount she personally borrowed from local banks. He also procured loans from a brother-in-law and one from another person. The business does not appear to have prospered at any time.

A few weeks after opening up the grocery business, Marrs arranged with Hicks Company, Limited, for a limited line of credit, payable weekly, and they sold him regularly on this basis. He began to default in his weekly payments, and on October 1, 1936, was due the firm $307.12. The condition of the account and tardy payments thereon aroused some uneasiness on the company's part, and its credit manager, W. D. Sandifer, went to Marrs' place of business to and did interview him and defendant concerning the past due indebtedness. His firm was unwilling to extend further credit to the business unless the account was paid in full, secured, or otherwise satisfactorily arranged. Mr. Sandifer gave the following testimony touching the nature of his conversation with Mrs. Marrs on this visit, and her commitment to him, viz.:

"Q. In this suit, Mr. Sandifer, the Hicks Company claim that Mrs. Beulah Blaxton Marrs is indebted unto them in the sum of Sixteen Hundred Eight Dollars and Fourteen Cents for merchandise sold and delivered to her between the dates of December 11th, 1936, and continued on down through January 23rd, 1937, is that correct? A. Yes, sir.

"Q. Has that been paid? A. No, sir.

"Q. To whom were those goods stated in the account sold and delivered? A. Mrs. Marrs.

"Q. Mrs. Beulah Blaxton Marrs? A. Yes, sir.

"Q. Did you ever consult Mrs. Marrs, before selling these goods to her? A. Yes, sir.

"Q. Just state to the Court what took place in that conversation between you and Mrs. Marrs? A. Along in the early part of October, the account of Mrs. Marrs was building up a little and I asked her who owned the business and she says, "I own it" and she assured me that she would be responsible for the account, that she owned the business. She also stated that she owned oil interests in Rodessa.

"Q. Did you consult Mr. Marrs at any time at all before the delivery of these goods for which this account is claimed here against Mrs. Beulah Blaxton Marrs? A. I have talked to him on various occasions about the account, but so far as asking him for a settlement, no, I did not.

"Q. Was it after the conversation in October, 1936, that all of the merchandise for which judgment is asked in this petition, were sold and delivered to Mrs. Marrs? A. Yes, sir.

"Q. Why did you sell them to her? A. On her representations to me that she owned the business, and she stated she had ample assets with which to take care of the account."

Mr. Marrs gave the following illuminating testimony, anent this interview, viz:

"Q. When was the first time that Hicks Company knew Mrs. Marrs? A. I do not think that Mr. Sandifer knew Mrs. Marrs until she came there to keep my books. (This was in September, 1936)

"Q. That was when the business conducted under the name of Marrs Grocery and Market started to expand after she came there? A. No, sir, expanded before that; it was expanding and getting in bad shape.

"Q. It was then your credit was getting in bad shape? A. Yes, sir.

"Q. That was about the time when Mrs. Marrs came there that your credit was being questioned? A. Yes, sir, about that time.

"Q. Didn't Mr. Sandifer come there and talk to Mrs. Marrs about that time, about extending further credit? A. Mr. Sandifer talked to Mrs. Marrs and myself frequently about the credit.

"Q. What did you tell him? A. Well, always told him that I felt sure I could make it through, and they would not lose any money, if they would give me time.

"Q. And did you tell him what assets you had to stand behind it if he extended credit? A. I did not have any assets.

"Q. Did you tell him that? A. Yes, sir.

"Q. You told him that you had no assets when he came there in regard to extending further credit? A. I do not remember Mr. Sandifer asking me in regard to my assets.

"Q. Did he ask in regard to assets? A. He tried to get my wife, I think, to sign for her assets.

"Q. When was that? A. When that statement was made there.

"Q. He knew and you stated that you told him, you had none, no assets in September, 1936. That is correct? A. I do not remember the exact date when it was.

"Q. It was about that time? A. It must have been."

Mr. Sandifer was satisfied from Marrs' admission that he had no assets, and from Mrs. Marrs' declaration that she had taken over and then owned the business, to go ahead and extend the business additional credit, and look to defendant for payment. This was done. He naturally concluded that, if Marrs had no assets, the business necessarily belonged to his wife, especially in view of her own admission of ownership. Mrs. Marrs denies that she told Sandifer that she owned the business or would be responsible for its liabilities. We are convinced that she is in error on this score. It is unthinkable that Sandifer's firm would have sold this business any more merchandise in the face of its known financial condition, unless he knew that some one was obligated to pay for it besides Marrs. The fact that the account, so soon after this interview, began to steadily mount, with but small payments thereon, until it reached the amount sued for, argues forcefully and convincingly that Mrs. Marrs was looked to for payment. This would not have been done, in the ordinary and usual run of things of this character, but for a commitment of liability on her part.

In the course of the discussion of the past-due account, Mrs. Marrs tentatively agreed to pledge to Hicks Company as security therefor a policy of insurance for $1,500, in which she was part owner. On advice of counsel, she receded from this proposition. In other respects, she evinced a willingness to do anything within her ability to satisfy this creditor, so that additional credit would be extended the business. It was then in financial distress. It owed large amounts for fixtures, borrowed money, and on open account. Its credit was materially impaired. It faced a crisis. In these circumstances, it was not surprising that defendant, who is shown to have a good credit and to own an interest in producing oil wells in the Rodessa oil field, would have come to its rescue. For the business to collapse for lack of her support, in the respects mentioned, she must have known would result in loss of the amounts she had advanced to it.

Prior to September, 1936, defendant exercised no control over, nor did she actively participate in, the operation of her husband's business. In the early part of this month, when the business was on the "rocks" financially, she joined him in conducting its operations, and was daily present in the store and took an active part in its affairs until closed by the sheriff on February 1, 1937. The duties of bookkeeper, it is asserted, were assigned to her. However, during the months of October, November, and December, another person was regularly employed to keep the company's books.

When she entered the business, its bookkeeping system was changed, the old bank account was closed, and a new one opened up in the name of Marrs' Grocery and Market; and defendant was authorized to issue and sign checks against the account. Thereafter, she borrowed money individually and placed same to the credit of the account of this business. She issued practically all checks thereafter, and conducted the only sales meeting of the employees that was ever held. The various financial statements of the business' condition do not carry her as a credit for any amount.

In early January, 1937, at the insistence of creditors, a detailed statement of the business' condition was prepared by a competent bookkeeper, with defendant's assistance. Among the assets (debits) listed on the trial balance sheet appears these:

Oil Royalty ....................$5,000.00
Oil Producing Acreage.......... 9,000.00
Insurance—Cash Value......... 1,500.00

Explanatory of the first two of these items, Schedule A attached to the statement contains the following, to wit:

"Royalty:

"This Royalty is a potential Asset, consisting of ⅛ royalty in a producing oil well in the Rodessa Field, paying monthly payments of $150.00, until the amount of $5,000.00 is paid in.

"Oil Producing Acreage

"This is also a potential asset, I own ¼ interest in six (6) Acre tract, in proven oil territory. Refused $36,000.00 for acreage, and allow me to keep the usual ⅛ interest. Listed as you see at $9,000.00, which is very conservative."

When asked why these two items were included in the list of assets (as they were her separate property), Mrs. Marrs said that it was done at the suggestion of Mr. Sandifer, who said it would help the business with its creditors to do so. Mr. Sandifer, when interrogated about the matter, admitted that he suggested that this be done because defendant told him positively the business was owned by her and, this being true, all her assets should be disclosed on any statement having for its purpose a true reflection of the company's condition, and what assets there were which could be made available to its creditors.

This schedule is headed thus:

"The Marr's Grocery—
W. G. Marrs, Prop."

No explanation is offered for including the insurance as an asset. Only one-quarter of it belonged to defendant.

In the early part of January, 1937, several representatives of creditors interviewed Marrs and defendant, and pressed them for payments. One of these representatives testified that defendant then said she owned the business; another said she would refer to the business as "ours" and as "my" business; to others she was not as definite. These declarations, however, were all made after the accounts arose and were past due. To two representatives, including that of plaintiff Shreveport Packing Company, she stated that a financial statement of the company's condition would (or did) reveal assets equal to $25,000, etc.

From all of the above-related facts and circumstances, plaintiffs deduce and contend that they disclose ownership of the business by Mrs. Marrs.

■ We are certain that Mrs. Marrs had no interest as owner in the business originally. She did what nearly all wives would do under same or similar conditions. She had some money and loaned it to her husband to enable him to expand his business activities. We are also of the opinion that this ownership experienced no transition in September, 1936, when she actively identified herself·with its conduct. Changes in details of operation and bookkeeping were set up, but these were evidently considered conducive to the success of the business. She was trying to save the "sinking ship" and, in the futile effort to do so, made some declarations which do not reflect true conditions, and permitted statements of the business' condition to embrace assets solely her own. But upon the faith of none of these declarations was credit extended by any one, save Hicks Company, Limited. On all said statements, W. G. Marrs' name was carried as proprietor. The style of the business was not changed at any time. He purchased equipment for the store in his own name as late as September 29, 1936. Occupational licenses were also in his name; the lease to the store building also.

■ We are of the opinion that Mrs. Marrs is liable to Hicks Company. for payment of the account sued on. Her actions and declarations, above related, induced this firm to extend additional credit to Marrs' Grocery and Market, when in failing circumstances. They were thereby lulled into the belief that she owned the business and was therefore responsible for its obligations. Acting upon her representations, this firm changed its attitude towards the business in which she had a material pecuniary interest, and now faces certain loss of the account sued on unless she is judicially held liable therefor. The elementary dictates of justice and equity, in view of the facts of the case, preclude escape by her of such responsibility.

■ There is no merit in the contention that Mrs. Marrs' promise to pay the account of Shreveport Packing Company bound her to such payment. Her promises were qualified, and, in addition, were made after the account came into existence. Only written evidence was competent to prove such a commitment.

"'Estoppel by Conduct.' If a person by his conduct induces another to believe in the existence of a particular state of facts, and the other acts thereon to his prejudice, the former is estopped, as against the latter, to deny that that state of facts does in truth exist." 21 Corpus Juris 1060.

In consonance with this definition, the court in Bradford-Kennedy Co. v. Brown, 152 La. 29, 38, 92 So. 723, succintly lays down the rule to be as follows, viz.:

"It is well settled that, when a person has done or said something with intent to influence the dealings of another, and the other has acted upon the faith of it, the former ought not to be permitted to change it to the injury of the latter. Sicard v. Gumbel, 112 La. 483, 36 So. 502; Chatman v. Bundy, 130 La. 158, 57 So. 786; Breaux v. Lumber Co., 125 La. 421, 51 So. 444;

Ledoux's Heirs v. Lavedan, 52 La.Ann. 311, 27 So. 196; Jones v. Jones, 51 La. Ann. 636, 25 So. 368; Alexander v. Bourdier, 43 La.Ann. 321, 8 So. 876; Lippmins v. McCranie, 30 La.Ann. 1251; Blanchard v. Allain, 5 La.Ann. 367, 52 Am.Dec. 594; Beach v. McDonough, 5 Rob. 352." See, also, Morehouse Ice Co. v. Tooke & Reynolds, La.App., 154 So. 402; Curl v. Ruston State Bank, 104 La. 548, 29 So. 234; U. S. Fidelity & Guaranty Co. v. Putfark, 180 La. 893, 158 So. 9.

The converse of the rule is exemplified in Wilkinson v. Macheca, 158 La. 183, 103 So. 733.

For the reasons herein assigned, the judgment in the suit of Shreveport Packing Co. v. Mrs. W. G. Marrs, No. 5570 on docket of this court, appealed from, is affirmed with costs; and, for said reasons, the judgment in suit of Hicks Co., Limited, v. Mrs. Beulah B. Marrs, wife of W. G. Marrs, No. 5567 on docket of this court, appealed from, is annulled, avoided, and reversed, and, accordingly, there is now judgment in favor of the said Hicks Company, Limited, and against Mrs. Beulah B. Marrs, wife of W. G. Marrs, defendant, for the sum of $1,608.14 with 5 per cent. per annum interest on $836.92 thereof, from January 1, 1937, and on $871.22 thereof, from February 1, 1937, until paid, and costs of suit.